JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

PATRICE KANTZ

**(b)** County of Residence of First Listed Plaintiff  Georgetown
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Susan Saint-Antoine, Esq., Console Mattiacci Law, 1525 Locust Street, 9th Fl., Philadelphia, PA 19102

## DEFENDANTS

AT&T, INC.
AT&T SERVICES, INC.

County of Residence of First Listed Defendant  Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' / Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability / ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine / Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Product Liability / ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | ☐ 362 Personal Injury - Medical Malpractice / Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 621, et seq.

Brief description of cause:
Plaintiff was discriminated against because of her age.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  in excess of $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:

JUDGE _____  DOCKET NUMBER _____

DATE  01/30/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ Murrells Inlet, SC 29576 _____

Address of Defendant: _____ 208 S. Akard, St., Dallas, TX 75202 _____

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 01/30/2020 _____ _~signature~_ _____ 55799
                                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
    *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
    *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Susan Saint-Antoine _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 01/30/2020 _____ _~signature~_ _____ 55799
                                        *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

PATRICE KANTZ                                     :                     CIVIL ACTION
                                                  :
                                   v.             :
AT&T, INC.                                        :
and                                               :
AT&T SERVICES, INC.                               :                     NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.               ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                               ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                  ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (X)


| 01/30/2020 | | Plaintiff, Patrice Kantz |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-545-7676 | 215-565-2855 | santanto@consolelaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PATRICE KANTZ**<br>  **Murrells Inlet, SC  29576,**<br>  *on behalf of herself individually*<br>  *and on behalf of those similarly*<br>  *situated,* | : <br> : <br> : <br> : <br> : |
| **Plaintiff,** | : <br> : |
| **v.** | : |
| **AT&T, INC.**<br>  **208 S. Akard St.**<br>  **Dallas, TX  75202,** | : <br> : <br> : <br> : |
| **and** | : |
| **AT&T SERVICES, INC.**<br>  **208 S. Akard St.**<br>  **Dallas, TX  75202,** | : <br> : <br> : <br> : <br> : <br> : |
| **Defendants.** | : |

CIVIL ACTION NO. __

ADEA COLLECTIVE ACTION

JURY TRIAL DEMANDED

## COMPLAINT

### I.   PRELIMINARY STATEMENT

AT&T, at the highest levels of the company, has expressed its displeasure at having an aging workforce, its intention to transform the company for the future, and its desire and expectation that older workers will leave its workforce.  Toward that end, AT&T undertook a course of action designed to terminate the employment of older workers through a centrally planned workforce reduction in its Technology & Operations ("ATO") business unit that was announced by ATO's President, Jeff McElfresh, on January 4, 2019.

In an e-mail message to all ATO management employees, President McElfresh described the upcoming workforce reduction in thinly veiled age biased terms.   President McElfresh told the ATO managers: "To win in this new world, we must continue to lower costs and keep getting *faster, leaner and more agile*. This includes reductions in our organization, and others across the company, which will begin later this month and take place over several months." (Emphasis added.) President McElfresh's message suggested that the workforce reduction in ATO would in some unspecified way involve geographic location.  Of course, to the extent that location was in fact a consideration, a workforce may intentionally be made *younger* through a reduction in force that considered location if, for example and without limitation, the areas in which a greater number of young employees were "located" (physically or simply by "assignment") were designated as the favored locations and/or exempt from reduction, the employees were assigned a location with the intent to discriminate based on age, a location was determined for purposes of the reduction because of age, or location was a factor in the selection process used as a pretext for age discrimination.

AT&T's January 2019 workforce reduction in ATO was part of its long-term scheme and pattern or practice to replace older employees with younger ones.  It was designed to, and did, discriminatorily remove older employees from AT&T's workforce, and then intentionally deceive them into falsely believing that, in exchange for a severance benefit, they had released their right to sue the company for age discrimination.   AT&T knowingly presented to the older workers terminated as part of its January, 2019 ATO reduction a "General Release and Waiver" that was materially identical to AT&T's General Release and Waiver that the Honorable Timothy J. Rice of the United States District Court for the Eastern District of Pennsylvania <u>had already determined to be in violation of the Age Discrimination in Employment Act ("ADEA")</u>.

The ADEA requires an employer seeking to obtain a release of age discrimination claims from a worker terminated as part of a group layoff to provide certain data and information regarding the group layoffs to allow the terminated worker to make an informed choice whether or not to sign a waiver agreement. AT&T knew when they offered the terminated older employees severance in exchange for the execution of their "General Release and Waiver" that the release was in violation of the ADEA, that it was not knowing and voluntary as a matter of law, and that, contrary to what the release stated, it was <u>not</u> a release of their right to sue the company for age discrimination under the ADEA. Further, AT&T fraudulently obtained from the older employees a waiver of their statutory right to proceed collectively on an ADEA claim by intentionally and falsely telling them, in effect, that they would be waiving the right to proceed collectively on a claim that they had released anyway.

Plaintiff, Patrice Kantz, a highly qualified and dedicated employee of A&T for more than 37 years who worked in ATO, was notified of her selection for surplus on January 28, 2019 and terminated from employment at age 57 on March 28, 2019. Plaintiff's physical location had no bearing on the performance of her job duties. AT&T determined for purposes of surplus selection that Plaintiff was assigned to a non-favored location which was not the location where she physically worked nor the location to which she expressly indicated a willingness to relocate. AT&T selected her for surplus and terminated her employment because of her age, and then obtained from her a General Release and Waiver in violation of the ADEA. Plaintiff now brings this action against Defendants, AT&T Services, Inc. and its controlling parent, AT&T, Inc., for violation of the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 621, *et seq.* Plaintiff brings this action as a collective action pursuant to the ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of

3

the Fair Labor Standards Act, 29 U.S.C. § 216(b), individually on behalf of herself and on behalf

of similarly situated older workers who have been harmed by AT&T's age discriminatory conduct,

defined as follows:

> All former employees of Defendants and their related affiliate companies who,
> when age 40 or over and employed in Defendants' ATO business unit, received a
> Surplus Notification Letter dated January 28, 2019, were terminated upon failing
> to secure an alternative position following surplus notification, and were presented
> with an invalid General Release and Waiver of Claims.

Plaintiff seeks, among other things, an Order providing that notice of this lawsuit be

given to each person who meets the proposed putative opt-in class definition.  This notice should

advise them that (1) any release agreement that they may have signed from AT&T is in violation

of the ADEA and did not, in fact, release Defendants from claims of age discrimination under the

ADEA; (2) this action is alleging that AT&T workforce reduction in ATO in first quarter 2019

was age discriminatory (3) they have the right to opt-in to this lawsuit as a plaintiff; and (4) they

do not repay any consideration that they received in exchange for signing a release in order to

opt-in to this lawsuit.

In addition, Plaintiff seeks injunctive and declarative relief, damages, including

compensatory and liquidated damages, and all other relief under the ADEA and any other relief

that this Court deems appropriate.

## II.   **PARTIES**

1.      Plaintiff, Patrice Kantz, is an individual and current resident of the state of South

Carolina, residing therein in Murrells Inlet, South Carolina, 29576.

2.      At the time of the age discrimination that is the subject of this action, Plaintiff lived

in, and worked for Defendants out of, Allentown, Pennsylvania.

3.      Plaintiff was born in January, 1962, and is currently 58 years of age.  She was 57 at the time of the termination of her employment.

4.      Defendant AT&T, Inc. is a Delaware corporation that is the parent company of several wholly-owned and controlled subsidiary corporations, including Defendant AT&T Services, Inc.

5.      Defendant AT&T, Inc. is the "alter ego" of its various controlled subsidiary companies, including Defendant AT&T Services, Inc.

6.      Defendant AT&T, Inc., by and through its wholly-owned and controlled subsidiary corporations through which it operates and does business, including AT&T Services, Inc., maintains multiple places of business in Pennsylvania, conducts business through its subsidiary companies duly registered to transact business in Pennsylvania, maintains systematic and continuous activity such that it is at home in Pennsylvania, and employs thousands of people in Pennsylvania, including employees subject to and impacted by the discriminatory practices and acts alleged herein and giving rise to this action.

7.      Defendant AT&T Services, Inc. is a Delaware corporation duly registered to transact business in the Commonwealth of Pennsylvania, with a registered agent located in Pennsylvania for service of legal process.  It maintains several places of business located throughout the Commonwealth of Pennsylvania and maintains systematic and continuous activity such that it is "at home" in Pennsylvania.

8.      At all times material hereto, Defendants have been engaged in an industry affecting interstate commerce and have acted as "employers" of Plaintiff and various members of the putative class within the meaning of the ADEA.

9.      Defendants share common ownership, management, administrative services, personnel, policies and employment practices.

10.      Defendants hold themselves out to the public and their employees as part of an interconnected AT&T "family of companies" known as "AT&T" which, together and as one entity, employ over 270,000 people.

11.      Defendants are interconnected such that they are considered a "single" and/or "integrated" employer and/or enterprise.

12.      Defendant AT&T Services, Inc. is subject to the personal jurisdiction of this Court because, *inter alia*, the case arises out of or relates to the contacts of AT&T Services, Inc. with the Commonwealth of Pennsylvania, the contacts of AT&T Services, Inc. are continuous and systematic such that AT&T Services, Inc. is at home here, and/or AT&T Services, Inc. has consented to personal jurisdiction by personal service within the Commonwealth via an authorized agent of the corporation.

13.      Defendant AT&T, Inc. is subject to the personal jurisdiction of this Court because, *inter alia*, the case arises out of or relates to the contacts of AT&T, Inc. with the Commonwealth of Pennsylvania, the contacts of AT&T, Inc. are continuous and systematic such that AT&T Services, Inc. is at home here, and/or AT&T, Inc. has consented to personal jurisdiction by personal service within the Commonwealth via an authorized agent of the corporation.   Among other things, and without limitation, the centrally planned and discriminatory workforce reduction that was announced on January 4, 2019 was implemented, at the direction and control of AT&T, Inc., in the AT&T's Technology & Operations business unit in the first quarter of 2019 without regard to corporate formalities or distinctions, such as the identity of the W-2 issuing entity of the employee.

14.     At all times material hereto, Defendants employed more than twenty (20) people.

15.     At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

## III.     <u>JURISDICTION AND VENUE</u>

16.     The causes of action set forth in this complaint arise under the ADEA, as amended, 29 U.S.C. § 621, *et seq*.

17.     The District Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

18.     Venue is proper under 28 U.S.C. § 1391(b).

19.     On or about July 28, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination alleged herein.  Attached hereto, incorporated herein, and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with minor redactions for purposes of electronic filing of confidential/identifying information).

20.     On or about November 4, 2019 the EEOC issued to Plaintiff a Dismissal and Notice of Right to Sue for Plaintiff's EEOC Charge.  Attached hereto and marked as Exhibit "2" is a true and correct copy of that Notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

21.     More than 60 days have passed since Plaintiff filed her EEOC charge with the EEOC.

22.     Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

7

## IV.   FACTUAL ALLEGATIONS

23.    AT&T has engaged in systemic age discrimination against its employees age 40 or over ("older workers" or "older employees"), including Plaintiff.

24.    AT&T, by its actions set forth herein, intentionally discriminated against its older workers, including Plaintiff.

25.    AT&T, by its actions set forth herein, have maintained a pattern or practice of age discrimination against older workers, including Plaintiff.

26.    In the alternative, to the extent that AT&T has not intentionally discriminated against it older employees, AT&T's use of one or more of each facially neutral policy or practice as set forth herein had a disparate impact on older employees, including Plaintiff.

### *AT&T's Expressed Intention of Transforming Its Aging Workforce And Its 2019 First Quarter Reduction In ATO In Furtherance Thereof*

27.    AT&T has undertaken a massive effort to "transform" and rebrand itself from yesterday's Ma Bell to a nimble, internet and cloud-based company with "workers of the future."

28.    AT&T at the highest levels has publicly discussed its displeasure at having an aging workforce, its intention to transform the company for the "future," and its desire and expectation that older workers will leave its workforce.

29.    AT&T's Chief Executive Officer, Randall Stephenson, has publicly discussed that AT&T has an aging workforce and had a need to reinvent the company. *See Gearing Up for the Cloud, AT&T Tells Its Workers: Adapt or Else,* http://www.nytimes.com, February 13, 2016.

30.    AT&T has touted its "Technology Transformation," including "building a workforce for the future," and boasted that the future AT&T workforce will differ greatly from today's workforce in many ways.

31.     AT&T has for years been saying that it needs to be "leaner, faster and more agile" and would be a different company by 2020.

32.     Toward that end, AT&T has engaged in a series of efforts to eliminate older employees from its workforce and replace them with younger ones.

33.     AT&T has exhibited a corporate culture of age bias.  Among other things, and without limitation:

    a.  AT&T publicly flouts the ADEA by continuing to use a General Release and Waiver that violates the ADEA.

    b.  CEO Stephenson has publicly expressed his expectation that many older workers will exit the AT&T workforce by 2020, which he considered to be a positive thing for the company.

    c.  AT&T's leader of its Communications business segment, John Donovan, has publicly discussed AT&T's "sprint to reinvent itself," and has publicly noted that "AT&T employs about 280,000 people, most of whom got their education and foundational job training in a different era" and that the average tenure at the company is 22 years and that most of AT&T's employees were educated and trained "in a different era."  In these same comments, Mr. Donovan noted that AT&T redesigned its "practice" by, among other things, redesigning compensation so that it "de-emphasized seniority."

    d.  Mr. Donovan expressed that the company was "using innovative solutions to widen, develop and diversify the talent pipeline to address the shortage of current and future technology experts" through such things as "AT&T Aspire."   "AT&T Aspire" is a program aimed at developing students as the "next generation of creative thinkers."

    e.  As part of its plan to reinvent its aging workforce, AT&T has publicly expressed age-based stereotypes and has acknowledged that those age-based stereotypes are considered in workplace decisions.  *See, e.g., AT&T Prepares for a New World of Work:  The Changing Work Force (Part 2)*(dividing its workforce by age, characterizing "Baby Boomers" as the workforce of "Yesterday," expressing without stated basis what is important to "Baby Boomers" as distinct from "Gen X" and "Gen Y" workers, explicitly stating that AT&T is taking these age-based stereotypical "factors into account when planning for our workplace of the future," and stating that by 2015, 90% of new hires will be from Gen X and Gen Y.

    f.  AT&T has described its "Workplace 2020: Transformation for the Future" as a "Next-Gen Workplace Experience."

9

    g. AT&T promotes age-defined Employee Resources Groups ("ERGs"). In 2011, AT&T founded an ERG entitled "OxyGEN, Young Professionals of AT&T," whose stated mission is "[t]o attract, develop and retain future leaders of AT&T." In 2014, AT&T launched an ERG entitled "50 & Forward AT&T Professionals Over 50," whose stated mission included "…to support a generation of young leaders at AT&T…". Among the group's publicized initiatives was ""Workforce 2020': 'Better Together' initiative for preparing younger managers to lead an aging workforce.'"

    h. AT&T has openly expressed its desire to hire and retain young employees, and considers age in hiring decisions. For example, and without limitation, its "Leadership and Development Programs," "Technology Development Program" and "Flex Force" are programs intended to recruit young employees into leadership roles.

34.    AT&T has offered incentives to older employees to voluntarily leave its workforce.

35.    AT&T has for several years conducted vast involuntary terminations with the intent of eliminating older workers from its workforce. Without limitation:

    a. AT&T at the highest level contemplated the overall replacement of its older workforce with a younger one, and set up its forced surplus reduction program so as to stagger the terminations over time and different areas in order to conceal from its older employees the overall impact of its "transformation" efforts.

    b. Crucial to AT&T's age discriminatory plan to replace its older workforce with a younger one are: a) concealing the age discrimination from the terminated older employees, while at the same time b) obtaining from them a release of their right to sue the company for age discrimination in violation of the ADEA. The involuntary terminations have involved a three-step notification of "surplus" status, a period during which "surplussed" employees remain employed and try to secure alternative positions with AT&T, and the presentation of a fraudulent General Release and Waiver. By staggering the surplus notifications from the actual terminations, AT&T keeps its employees in the dark as to who is actually going to lose their job. By offering vulnerable older employees severance in exchange for a General Release at the time of surplus notification and providing unintelligible surplus selection data – not termination data – AT&T fraudulently obtains a release of an employee's claim that he or she was terminated because of age.

    c. AT&T is currently subject to several age discrimination lawsuits arising from its workforce surplus reductions. It has been alleged, among other things and without limitation, that AT&T managers "target" employees for selection of surplus and/or termination; that AT&T has excluded younger employees from consideration for

surplus and they are thus exempt from possible termination; and that AT&T managers have asked their older employees if they plan to retire.

d.  A jury found that former AT&T employee John Gerundo proved that his age was the determining factor in the decision to surplus his employment in connection with a reduction in force. *Gerundo v. AT&T Servs.*, 2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 21, 2016)(denying AT&T's post-trial motion for judgment as a matter of law, and upholding the jury's verdict).

e.  AT&T has, since *Gerundo*, continued to follow the same Surplus Guidelines in effect since 2011.

f.  On January 11, 2019, the Honorable Timothy J. Rice of the United States District Court for the Eastern District of Pennsylvania, found that the General Release and Waiver Agreement presented to employees who had been surplussed then involuntary terminated violated the ADEA, as amended by the Older Workers Benefits Protection Act, and was not an enforceable waiver under the ADEA. *Allison Ray v. AT&T Mobility Services,* LLC, Civil Action No. 2:18-cv-03303 – TR (E.D. Pa. Jan. 11, 2019).

g.  AT&T, since the Court's decision in *Ray*, has continued to use the same General Release accompanied by the same legally deficient OWBPA disclosures.

h.  AT&T has fraudulently obtained from its terminated older employees a purported waiver of their statutory right to proceed collectively on an ADEA claim by intentionally and falsely telling them, in effect, that they would be waiving the right to proceed collectively on a claim that they had released anyway.

i.  By fraudulently obtaining from its older employees a purported collective action waiver, AT&T has managed to keep older employees in the dark about its unlawful General Release and Waiver and has continued to use it in violation of the ADEA without significant consequence and to the great detriment of countless older employees.

36.    AT&T has engaged in a pattern or practice of discrimination against its older employees, including Plaintiff.  Without limitation:

a.  It is AT&T's standard operating procedure to violate the ADEA.  AT&T has continued to present to its terminated older employees a purported General Release that a United States District Court has determined to be in violation of the ADEA.

b.  It is AT&T's standard operating procedure to make affirmative misrepresentations to its surplussed employees regarding the data it is providing to them when considering whether to release their federal age claims.

    c.  It is AT&T's standard operating procedure to intentionally discriminate against older employees by conditioning the receipt of a benefit, severance, upon the execution of an unlawful General Release and Waiver.  Terminated employees age younger than 40 are not required to sign an unlawful release in order to receive the same benefit.

    d.  AT&T has communicated its age-biased personnel goals throughout the entirety of AT&T, including throughout its Technology and Operations division.

    e.  AT&T executives at the highest level openly express that older employees leaving the AT&T workforce would be a positive thing for the company.

    f.  AT&T publicly expresses its desire to develop and retain younger employees to be its leaders of tomorrow.

    g.  AT&T has offered programs to incentivize older employees to leave the company.

    h.  AT&T's age bias from the top-down infuses and infects the employment decision-making process.

    i.  The percentage of older employees in AT&T's U.S. workforce has decreased.  For example, according to AT&T's 2017 and 2018 Diversity & Inclusion reports, the percentage of "Baby Boomers" in AT&T's U.S. workforce has decreased from 26% to 22%.

37.    In 2018, AT&T offered incentives to older employees to voluntarily terminate their employment, including a manager voluntary resignation offer and a one-time limited offer to retire by a certain date and take a lump sum pension benefit calculated based on interest rates that would yield a greater lump sum.

38.    On January 4, 2019, AT&T announced a workforce reduction in its Technology and Operations division.

39.    AT&T's Technology and Operations division is part of AT&T's Communications segment (then led by Mr. Donovan), who reported to AT&T CEO and Chair Randall Stephenson.

40.    In a January 4, 2019 message, Jeff McElfresh, President of AT&T Technology and Operations, sent an e-mail message to ATO announcing upcoming reductions to occur in the ATO

organization, and others across the company, which were to begin later in January and take place over several months. Mr. McElfresh expressed that the company since 2014 has been saying that the organization needed to get "leaner, faster and more agile" and would be a "different type of company by 2020," and suggested that because the company must "keep getting faster, leaner and more agile," there would be surplus reductions based on a geographic rationale.

41.     Mr. McElfresh's January 4, 2019 message also reminded employees about the company's one-time-only offer to extend the 2018 interest rates for calculating pension lump sums, and that eligible employees who left employment by March 31, 2019 and elected to receive a pension lump sum by April 2019 would get the benefit of the 2018 interest rate, which yielded a greater lump sum payment amount than 2019 interest rates.

42.     President McElfresh told the ATO managers: "To win in this new world, we must continue to lower costs and keep getting faster, leaner and more agile. This includes reductions in our organization, and others across the company, which will begin later this month and take place over several months."

43.     President McElfresh's message stated: "The desire to be faster, leaner and more agile is also driving decisions regarding where it makes the most sense for employees to be located. It's critical for us to bring employees together to increase the pace of innovation and further develop the right skills in a more open, flexible, and efficient work environment. Therefore, our collaboration zones and hub cities become even more integral."

44.     The workforce reductions announced by Mr. McElfresh in January 2019 to take place across ATO in the following months amounted to a single decision, policy or plan that was infected with an age discriminatory aspect and which impacted Plaintiff and the putative class members in the *same* fashion.

13

45.     AT&T made the decision to conduct a reduction in force that purportedly considered location in order to eliminate older employees from its workforce.

46.     In fact, the purported consideration of location was a pretext for age discrimination.

47.     In the alternative, and upon information and belief, the consideration of location in the workforce reduction had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

48.     AT&T made the determination as to which geographic locations would be favored in and/or exempt from workforce reduction with the intent to discriminate against older employees.

49.     In the alternative, and upon information and belief, the determination as to which geographic locations would be favored in and/or exempt from workforce reduction had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

50.     AT&T made the determination of an employee's location with the intent to discriminate against older employees.

51.     In the alternative, and upon information and belief, the determination as to an employee's location had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

52.     The ATO organization in which the workforce reduction was to occur was a pre-existing organizational entity.

53.     The surplus event that was announced in ATO in January, 2019 did not impact the entirety of ATO.  Instead, AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees.

14

54.     AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees per the policies and practices set forth in its Surplus Guidelines.

55.     AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees with the intent of discriminating against older employees.

56.     In the alternative, the use of the Surplus Guidelines to determine which AT&T employees in ATO would be subject to possible termination and how to group them for purposes of making the surplus selection decisions had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

57.     AT&T formulated "business cases" for purposes of selecting employees for surplus.

58.     AT&T's determination of the scope and population of the "business cases" collectively was intended to discriminate against older employees.

59.     AT&T determined the scope and population of an individual "business case" for purposes of selecting employees for surplus.

60.     AT&T's determination of the scope and population of an individual "business case" was intended to discriminate against older employees.

61.     An individual "business case" was comprised of "Affected Work Groups."

62.     AT&T formulated Affected Work Groups for purposes of selecting employees for surplus.

63.     AT&T's determination of the scope and population of the Affected Work Groups collectively was intended to discriminate against older employees.

64.     AT&T determined the scope and population of each Affected Work Group for purposes of selecting employees for surplus.

65.     AT&T's determination of the scope and population of each "Affected Work Group" was intended to discriminate against older employees.

66.     On January 28, 2019, AT&T notified those employees in ATO who were selected for "surplus."

67.      Each surplussed employee received the standard surplus packet of materials that AT&T has used for years.

68.     Each surplussed employee received the same standard form letter, stating the exact same reason for his or her surplus selection:   "Throughout the past several weeks we have been evaluating certain business units within the AT&T family of companies.  After a thorough and careful review, we have determined that the position which you currently hold will be eliminated.  This is due to a reduction in positions within your level and organization.  As a result of this decision, you will be placed on surplus …"

69.     The Surplus Notification letter did not indicate that location was used as a consideration in the reduction process.

70.     Following their selection for "surplus," AT&T presented to Plaintiff and putative class members the same, standard form General Release and Waiver forms,.

71.     A materially identical General Release and Waiver has been determined by the United States District Court for the Eastern District of Pennsylvania to be in violation of the ADEA.

72.     Defendants are estopped from asserting the validity or enforceability of the General Release and Waiver.

73.     Defendants knew when they presented the General Release and Waiver to the surplussed older employees that it was in violation of the ADEA.

74.     Defendants intentionally violated the ADEA by presenting the General Release and Waver to its older employees.

75.     The General Release and Waiver presented to Plaintiff and putative class members is invalid and unenforceable as to rights and claims under the ADEA.  It contains material misstatements of fact, is misleading, is not knowing and voluntary, and fails to comply with the strict informational disclosure requirements of the OWBPA.

76.     The General Release and Waiver was presented along with "ADEA Listings" containing the ages and job titles of those employees selected for surplus status, not those employees who were actually terminated in each Business Case.

77.     Without limitation: the General Release and Waiver offered to Plaintiff and the putative class members is fraudulent and unenforceable for the following reasons, without limitation:

    a.     The General Release and Waiver and accompanying ADEA Listing do not sufficiently identify the "Decisional Unit" in a manner calculated to be understood by the average worker. *See Ray v. AT&T Mobility Services, LLC,* ECF Nos. 28 & 29.

    b.     The General Release and Waiver provides none of the disclosures required for a knowing and voluntary waiver of claims under the ADEA, including the right to bring an age discrimination lawsuit.

    c.     The General Release and Waiver provides no information to terminated workers as to who is actually being terminated and who is being retained.

    d.     The General Release and Waiver provides no meaningful information,  in a manner calculated to be understood by the average individual, regarding the

17

criteria used for placing certain employees on surplus status.

  e.    The General Release and Waiver provides no meaningful information, in a manner calculated to be understood by the average individual, regarding the "organization" to which an employee is assigned in the accompanying ADEA Listing.

  f.    The ADEA Listings purports to describe but in fact does not provide meaningful information as to the AWG category, the basis for employees receiving different AWG numbers, or why those with different AWGs are grouped together for purposes of the ADEA Listing.

  g.    Employees are not informed as to which AWG they are assigned.

78.    In the General Release, AT&T affirmatively and falsely represented to Plaintiff and the putative class members that, at the time of their selections for surplus, it had provided the ages and job titles of those "designated to participate in the [AT&T, Inc. Severance Pay Plan]." Defendant knew this to be false.  The AT&T, Inc. Severance Pay Plan required, as a condition of eligibility, that its participants had to have actually been terminated from employment.

79.    Accordingly, the General Release and ADEA Listings provided to Plaintiff and the putative class members affirmatively and falsely represented to them that, at the time of their terminations, it had provided to them the ages and job titles other employees who had been placed on surplus status *and* terminated.

80.    However, as of January 28, 2019, the date of the General Release and ADEA Listings, no one identified on the ADEA Listings provided to Plaintiff and the putative class members was actually eligible for participation in the Severance Plan because none of those employees had yet been terminated.  In fact, some employees who had been placed on surplus status along with Plaintiff and the putative class members were able to find other positions at AT&T within the sixty (60) day period.

81.    Thus, contrary to the affirmative and false representation contained in the General

18

Release, AT&T *did not*, and *could not have*, informed Plaintiff and the putative class members which employees were eligible for participation in the Plan.

82.     AT&T purposefully concealed from Plaintiff and the putative class members the demographic data as to actual terminations resulting from the workforce reduction because, upon information and belief, the termination data would reveal age discrimination.

83.     AT&T knowingly presented to Plaintiff and putative class members, a "General Release and Waiver" that the company knew was not a knowing and voluntary waiver as a matter of law.

84.     AT&T knowingly, intentionally and falsely told older terminated employees that they had released their right to sue the company for age discrimination under the ADEA, when, in fact, they did not.

85.     AT&T fraudulently obtained through the use of its unlawful General Release and Waiver a purported waiver of an older employee's statutory right to proceed collectively against AT&T on an ADEA claim.

86.     The purported waiver of claims and right to bring and/or participate in a collective and/or representative action under the ADEA presented to Plaintiff and putative class members is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

87.     The purported waiver of claims and right to bring and/or participate in a collective and/or representative action under the ADEA was not entered into knowingly or voluntarily by Plaintiff or the putative class members.

88.     The purported waiver of claims and right to bring and/or participate in a collective and/or representative action under the ADEA is so interwoven with the purported release of the individual ADEA claims of Plaintiff and the putative class members such that it is indivisible from

the same and cannot be separately enforced.

89.     The purported waiver of claims and right to bring and/or participate in a collective and/or representative action under the ADEA is a gratuitous promise not supported by adequate consideration.

90.     AT&T did not request from Plaintiff and the putative class members a manifestation of assent to the purported waiver of the right to bring or participate in a collective and/or representative action separate from the manifestation of assent requested for the release of their individual ADEA claims.

91.     AT&T fraudulently obtained from its terminated older employees a purported waiver of their statutory right to proceed collectively on an ADEA claim by intentionally and falsely telling them, in effect, that they would be waiving the right to proceed collectively on a claim that they had released anyway.

### ***Plaintiff Patrice Kantz***

92.     Plaintiff was a highly qualified and dedicated employee for AT&T for more than thirty-seven (37) years.

93.      From approximately May, 1991, Plaintiff held the position of Senior Technical Project/Program Manager in AT&T's Technology & Operations business unit ("ATO").

94.     Plaintiff was well qualified for the position of Senior Technical Project/Program Manager.  In fact, she was on the promotion list for advancement.

95.     Plaintiff's extensive knowledge, skills, experience, and record of achievement as a successful Senior Technical Project/Program Management employee were recognized by AT&T.

96.     Plaintiff received annual merit increases and performance-based bonuses, her annual performance reviews were positive, and her performance rating was in the top ten percent

(10%) of AT&T domestically and internationally.

97.     Since approximately 1996, Plaintiff was a teleworker who worked from her virtual office and from AT&T's satellite office in Allentown PA.

98.     Prior to that, Plaintiff had lived in Allentown and worked in Bedminster, New Jersey.

99.     Plaintiff worked on projects across the globe and across the country.

100.    Plaintiff's projects were software based, and Plaintiff's location had no bearing on the performance of her duties as a Senior Technical Project/Program Manager.

101.    The successful performance of Plaintiff's job duties did not require her to work in AT&T's satellite office in Allentown, Pennsylvania, or in any other particular physical location.

102.    In or about January, 2017, Plaintiff began reporting to Wendy Flynn, Area Manager (approximately age 52).

103.    Ms. Flynn was physically located in Pittsburgh, Pennsylvania.

104.    Ms. Flynn reported to Suzanne Halverson, Director (approximately age 46).

105.    Ms. Halverson was physically located in Redmond, Washington.

106.    In or about June, 2019, Ms. Halverson asked Plaintiff if she would be willing to relocate to Middletown, NJ.

107.    Plaintiff responded that she could not relocate to Middletown, New Jersey, but told Ms. Halverson that she would be willing to relocate to Bedminster, New Jersey.

108.    On January 28, 2019, AT&T notified Plaintiff that she had been selected for "surplus."

109.    Plaintiff received the same standardized surplus packet of materials that AT&T had used for years.

21

110.    The Surplus Notice letter provided to Plaintiff stated: "Throughout the past several weeks we have been evaluating certain business units within the AT&T family of companies. After a thorough and careful review, we have determined that the position which you currently hold will be eliminated.  This is due to a reduction in positions within your level and organization. As a result of this decision, you will be placed on surplus …"

111.    AT&T's statement that Plaintiff was selected for "surplus" because her position was eliminated is false and a pretext for discrimination.

112.    AT&T's statement that Plaintiff's position was eliminated was false.  According to the ADEA Listing AT&T provided to Plaintiff, there remained at least ten Senior Technical Project/Program Management employees in Plaintiff's "organization" for purposes of the surplus.

113.    Ms. Halverson told Plaintiff that she was placed on "surplus" status because she was not in one of AT&T's "collaboration zones" and that her position was being eliminated.

114.    Plaintiff received no explanation as to what a "collaboration zone" was.

115.    Plaintiff asked if AT&T had considered her expressed willingness to relocate and work in Bedminster, New Jersey.

116.    In connection with its investigation of Plaintiff's Charge of discrimination, AT&T among other things, stated to the EEOC: "Ms. Kantz was assigned in King of Prussia, Pennsylvania as a level 2 Senior-Technical Project/Program Manager…"

117.    Plaintiff did not work in King of Prussia, Pennsylvania.

118.    AT&T in 2018, upon information and belief, assigned Plaintiff to King of Prussia because of her age.

119.    In connection with its investigation of Plaintiff's Charge, AT&T told the EEOC that Bedminster, New Jersey was among the favored "geographically aligned ATO cities."

22

120.   AT&T's determination for purposes of surplus selection that Plaintiff was located in King of Prussia was a pretext for age discrimination.

121.   AT&T determined that Plaintiff was assigned to King of Prussia for purposes of surplus selection, rather than Bedminster, New Jersey – the location to which Plaintiff told Ms. Halverson she was willing to relocate – because of her age.

122.   AT&T did not select for surplus all individuals who were outside a preferred geographic location.

123.   AT&T presented to Plaintiff the standard form General Release and Waiver, which was accompanied by standard form AT&T ADEA Notice and ADEA Listing, which indicate dates "as of Jan. 28, 2019."

124.   AT&T presented to Plaintiff the same General Release and Waiver with accompanying disclosures that were materially identical to those a United States District Court had previously determined in the *Ray* case to be in violation of the ADEA.

125.   The General Release and Waiver signed by Plaintiff is invalid and unenforceable as to Plaintiff's ADEA claims.

126.   The General Release and Waiver's collective action waiver is invalid and unenforceable as to Plaintiff's ADEA claims.

127.   Following her "surplus" notification, Plaintiff applied for at least twelve open and available positions for which she was qualified.

128.   Plaintiff applied to a few teleworker positions.

129.   Most of Plaintiff's applications were for positions in Bedminster, New Jersey.

130.    Bedminster, New Jersey was a location where Plaintiff had previously worked, which Plaintiff told AT&T she was willing to work, and where, in fact, Plaintiff was willing to work.

131.    Apparently, and unbeknownst to Plaintiff, an employee's assigned location for purposes of the surplus selection was used by AT&T as a negative factor in the hiring selection process.

132.    AT&T did not even interview Plaintiff for the positions to which she applied and was qualified.

133.    AT&T did not offer Plaintiff a position and her employment was terminated effective March 29, 2019.

134.    AT&T's apparent restrictions regarding the hiring of surplus applicants based on the applicant's assigned location were intended to discriminate against older employees.

135.    AT&T's consideration of Plaintiff's location was a pretext for discrimination.

136.    AT&T rejected Plaintiff for these open positions for which she was qualified because of her age.

137.    In the alternative, and upon information and belief, AT&T's geographic restrictions applicable to the consideration of surplussed applicants for open positions and/or its consideration of an internal applicant's location (actual or assigned) had a statistically significant negative impact on the hiring rates of older applicants and/or the termination rates of older employees, including Plaintiff.

138.    Following Plaintiff's selection for surplus and termination, and according to AT&T's own documents, there remained at least ten Senior Technical Project/Program Management positions in Plaintiff's "Organization" for purposes of surplus selection.

139. According to AT&T's own documents, AT&T retained at least eight employees younger than Plaintiff in the position of Senior Technical Project/Program Management in Plaintiff's "Organization" for purposes of surplus selection.

140. According to AT&T's own documents, AT&T retained at least three employees substantially younger than Plaintiff in the position of Senior Technical Project/Program Management in Plaintiff's "Organization" for purposes of surplus selection.

141. Based on Plaintiff's knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, Plaintiff was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three substantially younger employees who were not selected for surplus.

142. Further, there remained several Senior Technical Project/Program Management employees, including at least nine (9) who reported to Flynn, and at least an additional two employees reporting to Flynn who performed the same functions as Plaintiff who held different job titles.

143. Following her termination, AT&T retained several younger Senior Technical Project/Program Management employees reporting to Ms. Flynn. Without limitation, AT&T retained the following substantially younger employees in the Senior Technical Project/Program Management position: Kenneth Lam (38); and Samieh Franklin (38).

144. Based on Plaintiff's knowledge, skills, and positive track record with AT&T, including in particular her twenty-four (24) years as a Senior Technical Project/Program Management employee, Plaintiff was better qualified than these substantially younger individuals who were retained.

145. AT&T selected Plaintiff for surplus because of her age.

146.    AT&T rejected Plaintiff's applications for at least twelve open positions for which she was qualified because of her age.

147.    AT&T terminated Plaintiff's employment because of her age.

148.    AT&T presented an invalid and unenforceable General Release and Waiver, including collective action waiver,  to Plaintiff because of her age.

149.    In the alternative, AT&T's consideration of location (actual or assigned) in connection with surplus selection decisions and/or consideration of a surplussed applicant's location (actual or assigned) had a statistically significant negative impact on the surplus selection and/or termination rates of older employees, including Plaintiff.

150.    As a direct result of AT&T's discriminatory conduct, Plaintiff has in the past incurred, and will in the future incur, economic losses, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

151.    Plaintiff brings this action pursuant to ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), individually on behalf of herself and on behalf of similarly situated older workers who have been harmed by AT&T's age discriminatory conduct.

152.    Plaintiff is similarly situated to putative collective action opt-in members in that, among other things and without limitation:  Each was age 40 or over when terminated in connection with AT&T's age discriminatory workforce reduction in ATO announced by its President on January 4, 2019; each was subject to a centrally planned workforce reduction with a uniform rationale; each was subjected to the same, standardized and centrally controlled surplus and termination policies and procedures; each was notified of surplus on January 28, 2019, and terminated employment on March 29, 2019; each was given the same standardized packet of

documents in connection with the reduction; each was informed in writing of the exact same reason for the decision to select them for surplus; each was discriminated against by AT&T because of their age; in the alternative, each was subject to the same facially neutral policies and practices that caused a statistically significant disparity in the surplus selection rates and/or termination rates of older employees; each was knowingly and intentionally presented with a "General Release and Waiver" that a federal district court had already found to be in violation of the ADEA; each was knowingly and falsely told by AT&T that they had released their right to sue AT&T for age discrimination under the ADEA when they had not; and AT&T fraudulently obtained from each a waiver of their statutory right to proceed collectively on their ADEA claims (which AT&T had unlawfully told them they had released).

## COUNT I
## VIOLATION OF THE ADEA
### (Disparate Treatment)

153.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint, as if fully set forth herein.

154.    AT&T intentionally discriminated against Plaintiff and the putative class members because of their age.

155.    By committing the foregoing acts of discrimination AT&T has violated the ADEA.

156.    As a direct result of AT&T's violation of the ADEA, Plaintiff and the putative class members have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

157.    AT&T's acts of discrimination in violations of the ADEA were intentional and willful under the circumstances and warrant the imposition of liquidated damages.

27

158.     As a direct and proximate result of AT&T's violation of the ADEA, Plaintiff and the putative class members have sustained the injuries, damages, and losses set forth herein.

159.     Plaintiff and the putative class members are now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&T's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

160.     No previous application has been made for the relief requested herein.

## COUNT II
## VIOLATION OF THE ADEA
## (Disparate Impact)

161.     To the extent that AT&T's facially neutral employment policies and practices have not been used by AT&T to discriminate intentionally against older employees, AT&T's use of one or more of each has resulted in a disparate impact against employees age 40 or over, including Plaintiff and the putative class members, as follows:

    a.  Upon information and belief, AT&T's policy to consider location in the ATO workforce reduction announced in January, 2019 has resulted in a statistically significant disparity in the selection for surplus rates of its older employees.

    b.  Upon information and belief, AT&T's policy as to which locations would be favored in and/or exempt from workforce reduction in the ATO workforce reduction announced in January, 2019 has resulted in a statistically significant disparity in the selection for surplus and/or termination rates of its older employees.

    c.  Upon information and belief, the determination of an employee's location in the ATO workforce reduction announced in January, 2019, has resulted in a

statistically significant disparity in the selection for surplus and/or termination rates of its older employees.

d.  Upon information and belief, AT&T's use of the Surplus Guidelines to determine which employees in ATO would be subject to possible termination  and how to group them for purposes of making the surplus selection decisions in connection with its January, 2019, surplus event has resulted in a statistically significant disparity in the selection for surplus and/or termination rates of its older employees.

e.  Upon information and belief, AT&T's geographical restrictions (actual or assigned work location) applicable to the consideration of surplussed applicants for open positions and/or its consideration of an internal applicant's geographic location code (actual or assigned) in hiring has resulted in a statistically significant disparity in the termination rates of its older employees surplussed in connection with the January 2019 surplus event in ATO.

f.  Upon information and belief, AT&T's consideration of geographic location (actual or assigned) in connection with surplus selection decisions and/or consideration of a surplussed applicant's geographic location (actual or assigned work location) in connection with its January, 2019, surplus event in ATO has resulted in a statistically significant disparity in the termination rates of older employees.

162.    AT&T, by the policies and/or practices set forth herein, has violated the ADEA.

163.    As a direct result of AT&T's violation of the ADEA, Plaintiff and the putative class members have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

164.    As a direct and proximate result of AT&T's violation of the ADEA, Plaintiff has sustained the injuries, damages, and losses set forth herein.

165.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&T's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

166.    No previous application has been made for the relief requested herein.

**COUNT III**
**VIOLATION OF THE ADEA – FAILURE TO COMPLY WITH THE OWBPA**

167.    Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint as though set forth in their entirety.

168.    Plaintiff, on behalf of herself individually and on behalf of all similarly situated employees, asserts claims against Defendants for violations of the OWBPA, as set forth herein.

169.    Defendants by their above-described improper and discriminatory acts, have violated the ADEA, as amended by the OWBPA.

170.    No members of the putative class, including Plaintiff, were given OWBPA-compliant releases; therefore, none released his or her claims under the ADEA.

171.    The General Release and Waiver given to Plaintiff and the putative class members did not constitute a valid release of claims or rights under the ADEA, including the right to bring and/or participate in a class, collective, or representative action.

172.    As a direct and proximate result of Defendants' failure to comply with OWBPA waiver requirements and violations of the ADEA, Plaintiff and the putative class members have

30

been misled regarding their rights under federal law and/or harmed in the prosecution of their claims under the ADEA.

173.    In addition to all other damages, Plaintiff and the putative class members are entitled to declaratory relief, declaring the General Releases and Waivers invalid as to all claims and rights under the ADEA.

174.    As a direct and proximate result of Defendants' failure to comply with OWBPA waiver requirements and violation of the ADEA, Plaintiff and the putative class members have sustained the injuries set forth herein.

175.    Plaintiff and the putative class members are now suffering and will continue to suffer irreparable injury as a result of Defendants' discriminatory acts unless and until this Court grants the equitable relief requested herein.

176.    In addition to all other damages, Plaintiff and the putative class members are entitled to equitable relief, including an injunction against Defendants from further using the non-OWBPA compliant release and notifying those who signed it of its invalidity.

## **RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and members of the putative class, respectfully requests that this Court enter judgment in her favor and against Defendant:

a)    conditionally certifying this matter pursuant to 29 U.S.C § 216(b) and facilitating notice to all members of the putative class of the existence of this lawsuit and their right to "opt-in" to the same.

b)    declaring the acts and practices complained of herein to be in violation of the ADEA;

c)    declaring the acts and practices complained of herein to be in violation of the

OWBPA;

d)       declaring the General Release and Waiver signed by Plaintiff and members of the putative class to be invalid and unenforceable as to claims brought under the ADEA;

e)       enjoining and restraining permanently the violations alleged herein;

f)       enjoining and restraining Defendant from raising the General Release as a defense to Plaintiff's claims in this matter or the claims of the putative class members;

g)       awarding compensatory damages to Plaintiff and members of the putative class to make them whole for all past and future lost earnings, benefits, and earnings capacity which they have suffered and will continue to suffer as a result of Defendant's discriminatory conduct;

h)       awarding liquidated damages to Plaintiff and members of the putative class pursuant to the ADEA;

i)       awarding Plaintiff and members of the putative class the costs of this action, together with reasonable attorney's fees;

j)       awarding Plaintiff and members of the putative class such other damages as are appropriate under the ADEA, OWBPA, and federal and state law; and

k)       granting such other and further relief as this Court deems appropriate.

Respectfully submitted,

**CONSOLE MATTIACCI LAW**

By:   /s/ Susan M. Saint-Antoine
Stephen G. Console
Laura C. Mattiacci
Susan M. Saint-Antoine
Daniel S. Orlow
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
console@consolelaw.com
mattiacci@consolelaw.com
santanto@consolelaw.com
orlow@consolelaw.com
(215) 545-7676 phone
(215) 545-8211 fax

*Attorneys for Plaintiff,*
*Patrice Kantz*

Dated:  January 30, 2019

# Exhibit "1"

| AMENDED CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | Q  FEPA<br>X  EEOC | |

| STATE OR LOCAL AGENCY: Pennsylvania Human Relations Commission |
|---|

| NAME (Indicate Mr., **Ms.**, Mrs.)<br>**Patrice Kantz** | HOME TELEPHONE NUMBER *(Include Area Code)*<br>redacted |
|---|---|

| STREET ADDRESS<br>redacted | CITY, STATE AND ZIP<br>Murrells Inlet, SC 29576 | DATE OF BIRTH<br>redacted |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>**AT&T, Inc.**<br>**AT&T Services, Inc.** | NUMBER OF EMPLOYEES, MEMBERS<br>**>200,000** | TELEPHONE (Include Area Code)<br>**(210) 821-4105** |
|---|---|---|

| STREET ADDRESS<br>**Charging Party's Work Location**<br>**1140 Catasauqua Avenue**<br>**AT&T Corporate Headquarters**<br>**208 S. Akard Street** | CITY, STATE AND ZIP<br><br>**Allentown, PA 18102**<br><br>**Dallas, TX 75202** | COUNTY<br><br>**Lehigh, PA**<br><br>**Dallas, TX** |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>Q Race  Q Color  Q Sex  Q  Religion   Q National Origin<br>Q Retaliation  **X Age**  Q Disability  Q  Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>*Earliest*                                    *Latest*<br>                                        **03-29-19 (ongoing)** |
|---|---|

**The Particulars Are:**

A.    1.    Relevant Work History

I was employed by AT&T, Inc. and its controlled subsidiary/payroll company, AT&T Services, Inc. (together, "AT&T"), from May 10, 1982 until the date of my unlawful termination of employment effective March 29, 2019.

At the time of my termination, I held the position of Senior Technical Project/Program Management. I last reported to Wendy Flynn, Area Manager (55[1]). I began reporting to Flynn in or about January 2017. Prior to reporting to Flynn, I had reported to Philip Gaito, Director Technical Operations (70). Flynn reported to Susan Halverson, Director (46).

At the time of my surplus notification and termination, I was age fifty-seven (57) with more than thirty-seven (37) years of service at AT&T.

| I want this charge filed with both the EEOC and the State or Local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| <br>7/28/19            *Patrice Kantz*<br>Date            *Charging Party Signature* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

---

[1] All ages herein are approximations.

EEOC Charge of Discrimination, Page 2 of 8
Initials of Charging Party →PK

1.     Relevant Work History (continued)

I was a highly qualified and dedicated employee for AT&T for more than thirty-seven (37) years. My extensive knowledge, skills, experience, and record of achievement as a successful Senior Technical Project/Program Management employee were recognized by AT&T. Among other things, I received annual merit increases and performance-based bonuses, my annual performance reviews were positive, and my performance rating was in the top ten percent (10%) of AT&T domestically and internationally.

2.     Harm Summary

I believe that AT&T discriminated against me because of my age (57) as part of a centrally planned, corporate-wide (*i.e.*, AT&T, Inc. and the many subsidiary entities under its direction and control, self-identified as the AT&T "family of companies") involuntary group termination program, implemented in waves from at least March 1, 2013 and still continuing, intended to "transform" an aging workforce, and which intended to, and did, eliminate older workers and replace them with younger ones, while falsely and fraudulently telling the older workers that they had released claims under the Age Discrimination in Employment Act ("ADEA") when AT&T knew that they had not.

On January 28, 2019, AT&T notified me that that I was not in one of AT&T's collaboration zones, that the position that I held was being eliminated, and that I was being placed on "surplus status." I was to remain employed until March 29, 2019, at which time my employment was to be terminated if I had not been selected by AT&T for, and accepted, another position at AT&T.

On January 28, 2019, AT&T also presented to me a "General Release and Waiver" which fraudulently purported to release all claims against AT&T, including federal age discrimination claims with respect to my employment and (possible future) termination of employment. The General Release and Waiver was simultaneously accompanied by an "ADEA Listing" dated January 28, 2019 which, among other things, provided no information as to the identity of individuals actually terminated by AT&T.

After January 28, 2019, AT&T did not select me for any open and available positions with AT&T for which I was qualified and had applied.

AT&T terminated my employment effective March 29, 2019. That date was the commencement of the forty-five (45) day period for me to consider the General Release and Waiver. AT&T provided me at that time no disclosures required for an involuntary group termination pursuant to the Older Workers Benefit Protection Act ("OWBPA").

I signed and returned to AT&T the General Release and Waiver on March 28, 2019s. The purported waiver of my claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

B.     Respondents' Stated Reasons

AT&T has stated that I was placed on surplus status because I was not in one of AT&T's collaboration zones and my position was being eliminated. This is a pretext for age discrimination. The statement that my position was being eliminated was false, and I received no explanation as to what a "collaboration zone" was. Following the surplus, according to AT&T's own documents, there remained at least ten (10) Senior Technical Project/Program Management positions in my "Organization." Further, there remained several Senior Technical

EEOC Charge of Discrimination, Page 3 of 8
Initials of Charging Party ⟶PL

Project/Program Management, including at least nine (9) who reported to Flynn, and at least an additional three (3) employees reporting to Flynn who performed the same functions as me who held different job titles.

AT&T has not stated a reason why AT&T failed to select me for any open and available positions for which I was qualified and had applied.   I did not receive any response from AT&T to any of the positions for which I was qualified and had applied.

AT&T has stated that I was to be terminated if I was unable to secure another position within sixty (60) days of my being placed on surplus status.  AT&T gave a false and pretextual reason for my selection for surplus; AT&T has given no reason for its failure to select me for any one of the open positions for which I was qualified and had applied.

AT&T has not stated any reason for its fraudulent representation to me that by signing the General Release and Waiver I had released and waived my claims and rights under the ADEA, including my right to bring and/or participate in a collective and/or representative action, when AT&T knew that they had presented me with a General Release and Waiver that was invalid, unenforceable, and in violation of the OWBPA.

C.     Statutes Violated and Basis for Allegations

I allege that Respondents have discriminated against me based on my age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621. *et seq.* ("ADEA") and the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA").

Evidence of discrimination includes, but is not limited to (in addition to what is set forth herein):

1)  AT&T has a corporate culture of age bias and a public record of egregious age discrimination.

2)  AT&T's Chief Executive Officer, Randall Stephenson, has publicly discussed that AT&T has an aging workforce and had a need to reinvent the company. *See Gearing Up for the Cloud, AT&T Tells Its Workers: Adapt or Else,* http://www.nytimes.com, February 13, 2016.  As part of this reinvention, AT&T came up with a plan to "retool" its aging workforce by the year 2020.  *Id.*

3)  As part of its plan – variously called "Vision 2020," "Workforce 2020;" "Workplace 2020" – AT&T has publicly expressed age-based stereotypes and has acknowledged that those age-based stereotypes are considered in workplace decisions.  *See, e.g., AT&T Prepares for a New World of Work: The Changing Work Force (Part 2),* https://networkingexchangeblog.att.com/enterprise-business (dividing its workforce by age, characterizing "Baby Boomers" as the workforce of "Yesterday," expressing without stated basis what is important to "Baby Boomers" as distinct from "Gen X" and "Gen Y" workers, explicitly stating that AT&T is taking these age-based stereotypical "factors into account when planning for our workplace of the future," and stating that by 2015, 90% of new hires will be from Gen X and Gen Y).

4)  Upon information and belief, since at least March 1, 2013, and continuing until the present, AT&T has, as part of its plan to transform its workforce, conducted vast involuntary terminations (referred to herein as "2020" terminations) with the intent and effect of eliminating older workers from its workforce.  The massive and company-wide involuntary terminations were effectuated in waves across AT&T, Inc.'s various controlled/for payroll-purposes subsidiaries and in accordance with centrally planned,

from the top, corporate-wide policies and procedures infected with age bias and, upon
information and belief, causing a disparate impact on older workers.

a)  Upon information and belief, as part of the "2020" terminations, AT&T, per its
policies and procedures, notified certain workers that they were being placed on
surplus status and would be terminated if unable to secure another position with
AT&T within sixty (60) days. Employees were selected for surplus based on
centrally determined, company-wide ill-defined and/or subjective criteria in a
process infected with age bias. Without limitation, employees were assigned a
rating for "skills," but the "skills" supposedly assessed were not those necessary
to perform an actual job but a job of the "future" per "Vision 2020," thus
permitting managers to assign ratings based on the ageist stereotype that older
workers could not or would not acquire "high tech" skills necessary for these
future jobs.

b)  The process by which certain employees on surplus status were able to secure
another job within AT&T was infected with age bias. Among other things, the
centrally determined, company-wide surplus policies and procedures specifically
provided that managers could at their complete discretion notify certain – but not
all – employees on surplus status of job openings by sending to them a Career
Opportunity Notice ("CON"), thus permitting managers to act on unchecked age-
bias and notify younger workers only of open positions.  Moreover, per AT&T
policies and procedures, it was automatically made known to a hiring manager
when an application was received for an open job if the application was
submitted by an employee whom AT&T had selected for surplus status, thus
tainting that employee's application prospects.

c)  If an employee has not secured a position at the end of the sixty (60) day period,
an employee who had been placed on surplus status was terminated by AT&T.
AT&T offered such terminated employees severance in exchange for signing
what purported to be a general release of all claims (including their right to bring
suit, and/or participate in a collective/representative action under the ADEA).
AT&T knew that what it falsely told the older workers was a general release of
all claims was not a release and waiver of an older worker's right to bring and/or
participate in an individual and/or collective action alleging age discrimination
under the ADEA because the General Release and Waiver did not comply with
the disclosure requirements of the OWBPA.  Without limitation, **AT&T
provided to the older workers no information as to who was actually being
terminated and who was being retained.**

d)  AT&T affirmatively represented to the older, terminated workers that it had
provided to them at the time of the surplus notification the ages and job titles of
those "designated to participate in the Plan." <u>This was patently false.</u>  The Plan
referenced was the AT&T, Inc. Severance Pay Plan; to be eligible to participate
in it, among other things, one had to have been terminated from employment.
The list provided did not identify any one who had actually been terminated.  In
fact, some employees who had been placed on surplus status and listed on the
ADEA Listing were able to find other positions at AT&T within the sixty (60)
day period.  **Thus, AT&T fraudulently induced older workers to release
rights pertaining to their termination, while hiding from those older workers
information as to the ages of who was terminated and who was retained.**

e)  Upon information and belief, AT&T has for years, and at least since March 1,

2013, and continuing through the present, carried out in waves its "2020"
terminations with the intent and effect of terminating older workers from its
workforce, while retaining and hiring younger ones. AT&T has intentionally
kept the older workers in the dark about the scope of its terminations and
selection procedures, and has engaged in a massive fraud whereby older workers
were deceived as to the information they were receiving regarding who was
terminated and who was retained, and falsely led the older workers to believe that
they had waived their right to bring an action against AT&T for age
discrimination.

5)   Since at least 2013 until the time of my termination, AT&T has actively recruited outside
hires.

6)   I was notified by AT&T that I was placed on surplus status, terminated, and presented
with a fraudulent General Release and Waiver as part of AT&T's "2020" terminations.

7)   AT&T selected me for surplus, failed to select me for any open and available jobs for
which I was qualified and had applied, terminated my employment, and presented me
with a false and fraudulent General Release and Waiver because of my age.

8)   On January 28, 2019, AT&T notified me that I was not in one of AT&T's collaboration
zones, that my position was being eliminated, and that I was placed on surplus status with
sixty (60) days to try to find a job or else be terminated.

   a)   The statement that my position was being eliminated was false.

   b)   The statement that I was not in one of AT&T's collaboration zones was not
   explained me.

9)   On January 28, 2019, AT&T presented me with a purported General Release and Waiver
and accompanying "ADEA Listing." Among other things, and without limitation:

   a)   The General Release and Waiver and its accompanying materials purport to
   specify criteria but in fact provide no meaningful information as to the criteria
   used for selecting employees for surplus notification. The General Release and
   Waiver and its accompanying materials stated the following with regard to the
   criteria used for selecting employees for surplus notification: "The considerations
   when designating eligible employees for company initiated involuntary
   termination and participation in the AT&T Inc. Severance Pay Plan include some
   or all of the following: business needs, criticality of skills, job performance, role
   elimination, geographic location, and/or employee preference for displacement
   ('interest in leaving')."

   b)   The General Release and Waiver and its accompanying materials provided no
   information explaining the specific reason(s) for my selection for surplus
   notification.

   c)   The General Release and Waiver stated falsely that I was provided with the ages
   and job titles of those designated to participate in the Severance Plan. In fact, as
   of that date, no one identified on the ADEA Listing was eligible for the
   Severance Plan.

   d)   Accompanying documents were marked as "PROPRIETARY Not for use or

disclosure outside AT&T Inc. and all its wholly owned subsidiaries and controlled companies, except under written permission," thereby attempting to discourage me and other older workers from sharing the information with an attorney or other AT&T employees.

e) The information provided in the "ADEA Listing" was for an "Organization" identified as "Technical Field Services Juan Flores – SVP-Technical Field Services." There was no information explaining what this "Organization" identification meant, and no information provided as to how this Organization was determined or who was assigned to it.

f) The ADEA Listing contained a category entitled "AWG." The ADEA Listing defines "AWG" as "Affected Work Groups," which "are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected. An AWG may be any portion of an organization, described in terms of level, job title, similar job functions, geography, lines of organization or other definable attributes based on needs of the business. The combined AWGs comprise the Decisional Unit for this business case." The ADEA Listing purports to describe but in fact does not provide meaningful information as to AWG numbers, the AWG category, or AWG assignments. The ADEA Listing does not indicate why I was assigned to a certain AWG 13 and why others were assigned different AWG numbers.

g) The Release and General Waiver provided no information as to the basis a particular AWG number was assigned and why those with different AWGs are grouped together for purposes of the ADEA Listing.

h) The ADEA Listing does not indicate who among the employees was terminated.

i) AT&T failed to provide required information and disclosures under the OWBPA, including failing to provide the cumulative information regarding numbers of employees in my Decisional Unit.

10) The average age of the Senior Technical Project/Program Management employees included in the Organization was 54.29. The average age of the Senior Technical Project/Program Management employees in the Organization selected for surplus was 57.71.

11) I was apparently assigned to AWG 13. I was never told by AT&T the basis of my or others' assignment to AWG 13.

12) Per the ADEA Listing, of the seventeen (17) Senior Technical Project/Program Management employees assigned to "AWG 13," I was one (1) of seven (7) selected for surplus by AT&T. Of the ten (10) employees in AWG 13 that AT&T did not select for surplus status, eight (8) were younger than me, including some who were substantially younger (including three (3) employees under age fifty (50)).

a) Based on, *inter alia*, my knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, I believe I was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three (3) substantially younger employees, in AWG 13 who were not selected for surplus.

13) Per the ADEA Listing, there were seventeen (17) employees who held the Senior Technical Project/Program Management positions in the Organization, seven (7) of whom were selected for surplus. There were three (3) Senior Technical Project/Program Management employees younger than age fifty (50) who were not selected for surplus and were retained by AT&T.

   a) Based on, *inter alia,* my knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, I believe I was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three (3) substantially younger employees, who held that position, were not selected for surplus, and were retained by AT&T.

14) On March 29, 2019, AT&T terminated my employment.

15) AT&T retained several younger Senior Technical Project/Program Management employees reporting to Flynn. Based on, *inter alia,* my knowledge, skills, and positive track record with AT&T, including in particular my twenty-four (24) years as a Senior Technical Project/Program Management employee, I believe I was better qualified than these younger individuals who were retained. Without limitation:

   a) When I was terminated, AT&T retained the following substantially younger employees, without limitation, in the Senior Technical Project/Program Management position, reporting to Flynn: Kenneth Lam (38); and Samieh Franklin (38).

16) AT&T terminated the oldest employees reporting to Flynn. Without limitation:

   a) When I was terminated, AT&T terminated the following older employees, without limitation: Lisa Erman (55), Senior Technical Project/Program Management; and Flynn (55).

17) As of the termination of my employment on March 29, 2019, I was instructed to consider signing the General Release and Waiver in exchange for a severance payment.

   a) AT&T never provided me with the disclosures required by the OWBPA.

   b) AT&T never provided me with information indicating that it was the job titles and ages of those who had actually been terminated from employment.

   c) The "ADEA Listing" that was given to me on January 28, 2019 was not given to me at the commencement of the General Release and Waiver consideration period as explicitly required by the OWBPA.

   d) AT&T failed to provide to me in a manner calculated to be understood by the average individual eligible to participate in the Severance Pay Plan program the disclosures required for a knowing and voluntary waiver of my claims and rights under the ADEA, including my right to bring an age discrimination suit against them and to initiate and/or participate in a collective and/or representative action.

18) My performance was positive and did not warrant my selection for surplus, the fact that I was not selected for open positions for which I was qualified and had applied, or the termination of my employment.

19) Upon information and belief, AT&T's "2020" group involuntary termination program, including its centrally determined policies and procedures, had a disparate impact on older workers.

20) AT&T has demonstrated an intent to terminate the employment of older workers, including me, and retain younger workers instead.

21) AT&T fraudulently induced me and other older workers to sign a General Release and Waiver that they knew to be in invalid, unenforceable, and in violation of the OWBPA.

D.    Class Charge

I allege that AT&T has engaged in a pattern and practice of discriminating against older workers in violation of the ADEA. In that regard, I bring this Charge as a class and pattern and practice Charge on behalf of myself and any and all current or former employees, age forty (40) and over who have been adversely affected by AT&T's discriminatory practices (as a result of disparate treatment or disparate impact) in connection with its company-wide group terminations, implemented in waves pursuant to the same centrally determined and corporate-wide policies and procedures, since at least March 1, 2013 and continuing through the present, including but not limited to being placed on surplus status; being denied opportunities to secure or being rejected for open positions; and/or being terminated.

I further allege that AT&T has violated the ADEA, as amended by the OWBPA, and that the language, terms, and manner of presentation of AT&T's General Release and Waiver agreements utilized during the company-wide involuntary group terminations since at least March 1, 2013 and continuing through the present, is part of a pattern and practice to adversely treat and disparately impact me and similarly situated employees age forty (40) and over, and was a scheme in violation of the ADEA and OWBPA with the intention of deceiving me and other older workers into believing that we could not sign the General Release and Waiver, collect severance, and bring an age discrimination case against AT&T. In that regard, I bring this Charge as a class Charge on behalf of those individuals age forty (40) and over whom AT&T terminated as part of the involuntary group terminations since at least March 1, 2013, and continuing through the present, who were presented with a General Release and Waiver which purported to be a general release of all claims, including for age discrimination under federal law and the right to bring and/or participate in a collective and/or representative action under the ADEA, but which failed to comply with the OWBPA.

# Exhibit "2"

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Patrice Kantz<br>redacted<br>Murrells Inlet, SC 29576 | From: Philadelphia District Office<br>801 Market Street<br>Suite 1300<br>Philadelphia, PA 19107 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2019-04876 | Legal Unit,<br>Legal Technician | (267) 589-9700 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Dana R. Hutter*

_____
Dana R. Hutter,
**Deputy Director**

**November 4, 2019**
*(Date Mailed)*

Enclosures(s)

cc:     **AT&T**
**Laura Givens (for Respondent)**
**Employee Relations Manager**
**1057 Lenox Park Blvd**
**C-210**
**Atlanta, GA 30319**

**Emily R. Derstine Friesen, Esq. (for Charging Party)**
**CONSOLE MATTIACCI LAW, LLC**
**1525 Locust Street, 9th Floor**
**Philadelphia, PA 19102**