**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                          :
**PATRICE KANTZ**                         :
  **Murrells Inlet, SC  29576,**          :
  *on behalf of herself individually*     :
  *and on behalf of those similarly*      :
  *situated,*                             :
                                          :         **CIVIL ACTION NO. 2:20-cv-00531**
            **Plaintiff,**                :
                                          :         **ADEA COLLECTIVE ACTION**
        **v.**                            :
                                          :         **JURY TRIAL DEMANDED**
**AT&T, INC.**                            :
  **208 S. Akard St.**                    :
  **Dallas, TX  75202,**                  :
                                          :
        **and**                           :
                                          :
**AT&T SERVICES, INC.**                   :
  **208 S. Akard St.**                    :
  **Dallas, TX  75202,**                  :
                                          :
                                          :
                                          :
            **Defendants.**               :
_____         :

**AMENDED COMPLAINT**

I.    **PRELIMINARY STATEMENT**

        AT&T, at the highest levels of the company, has expressed its displeasure at having an

aging workforce, its intention to transform the company for the future, and its desire and

expectation that older workers will leave its workforce.  Toward that end, AT&T undertook a

course of action designed to terminate the employment of older workers through a centrally

planned workforce reduction in its Technology & Operations ("ATO") business unit that was

announced by ATO's President, Jeff McElfresh, on January 4, 2019.

In an e-mail message to all ATO management employees, President McElfresh described the upcoming workforce reduction in thinly veiled age biased terms.   President McElfresh told the ATO managers:  "To win in this new world, we must continue to lower costs and keep getting *faster, leaner and more agile*.  This includes reductions in our organization, and others across the company, which will begin later this month and take place over several months." (Emphasis added.) President McElfresh's message suggested that the workforce reduction in ATO would in some unspecified way involve geographic location.  Of course, to the extent that location was in fact a consideration, a workforce may intentionally be made *younger* through a reduction in force that considered location if, for example and without limitation, the areas in which a greater number of young employees were "located" (physically or simply by "assignment") were designated as the favored locations and/or exempt from reduction, the employees were assigned a location with the intent to discriminate based on age, a location was determined for purposes of the reduction because of age, or location was a factor in the selection process used as a pretext for age discrimination.

AT&T's January 2019 workforce reduction in ATO was part of its long-term scheme and pattern or practice to replace older employees with younger ones.  It was designed to, and did, discriminatorily remove older employees from AT&T's workforce, and then intentionally deceive them into falsely believing that, in exchange for a severance benefit, they had released their right to sue the company for age discrimination.   By the time AT&T notified ATO employees of their selection for the reduction in force (January 28, 2019):  a) a federal judge had entered summary judgment against the company for its violation of the Age Discrimination in Employment Act ("ADEA") in connection with its presentation of a purported "General Release and Waiver" to an older employee selected in November, 2017, for reduction in force; and b) the company had

engaged in the age discriminatory conduct in its decision to select the employee which, a jury concluded after a five day trial in 2021, the company either knew or showed reckless disregard for whether its selection was prohibited by law.  AT&T knowingly presented to the older workers terminated as part of its January, 2019 ATO reduction a "General Release and Waiver" that was materially identical to AT&T's General Release and Waiver that the Honorable Timothy J. Rice of the United States District Court for the Eastern District of Pennsylvania had already determined to be in violation of the ADEA).  *See Alison Ray v. AT&T Mobility Services, LLC* (E.D. Pa. 2:18-cv-03303-TR).

The ADEA requires an employer seeking to obtain a release of age discrimination claims from a worker terminated as part of a group layoff to provide certain data and information regarding the group layoffs to allow the terminated worker to make an informed choice whether or not to sign a waiver agreement.  AT&T knew when they offered the terminated older employees severance in exchange for the execution of their "General Release and Waiver" that the release  was in violation of the ADEA, that it was not knowing and voluntary as a matter of law, and that, contrary to what the release stated, it was not  a release of their right to sue the company for age discrimination under the ADEA.  Further, AT&T simultaneously via the same "General Release and Waiver" obtained from the older employees a waiver of their statutory right to proceed collectively on an ADEA claim by intentionally telling them, in effect, that they would be waiving the right to proceed collectively on a claim that they had released anyway. AT&T is a sophisticated company, armed with attorneys fully aware of the law's requirements, that undoubtedly considers carefully the consequences of its actions.  AT&T doesn't act by accident.  It is reasonable to infer from the totality of the circumstances (including, *e.g.,* age biased corporate culture, systemic age discrimination, expressed intention to transform its

workforce for the future, keen awareness of the law, intentional disregard of the ADEA) that AT&T intended the collective action waiver to be an integral part of the company's unlawful scheme to eliminate older workers from its workforce.  The ADEA aspect of the collective action waiver should not be enforced by the Court.

Plaintiff, Patrice Kantz, a highly qualified and dedicated employee of A&T for more than 37 years who worked in ATO, was notified of her selection for surplus on January 28, 2019 and terminated from employment at age 57 on March 28, 2019.  Plaintiff's physical location had no bearing on the performance of her job duties.  AT&T determined for purposes of surplus selection that Plaintiff was assigned to a non-favored location which was not the location where she physically worked nor the location to which she expressly indicated a willingness to relocate. AT&T selected her for surplus and terminated her employment because of her age, and then obtained from her a purported "General Release and Waiver" in violation of the ADEA.  Plaintiff now brings this action against Defendants, AT&T Services, Inc. and its controlling parent, AT&T, Inc. (collectively, "AT&T"), for violation of the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 621, *et seq.* Plaintiff brings this action as a collective action pursuant to the ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), individually on behalf of herself and on behalf of similarly situated older workers who have been harmed by AT&T's age discriminatory conduct, defined as follows:

> All former employees of Defendants and their related affiliate companies who, when age 40 or over and employed in Defendants' ATO business unit, were residents of Pennsylvania and worked for AT&T from locations in Pennsylvania, received a Surplus Notification Letter dated January 28, 2019, were terminated upon failing to secure an alternative position with AT&T following surplus notification, and signed AT&T's standard form "General Release and Waiver."

Plaintiff seeks, among other things, an Order providing that notice of this lawsuit be given to each person who meets the proposed putative opt-in class definition.  This notice should advise them that (1) the release agreement that they signed is in violation of the ADEA and did not, in fact, release Defendants from claims of age discrimination under the ADEA; (2) this action is alleging that AT&T workforce reduction in ATO in first quarter 2019 was age discriminatory (3) they have the right to opt-in to this lawsuit as a plaintiff; and (4) they do not repay any consideration that they received in exchange for signing a release in order to opt-in to this lawsuit.

In addition, Plaintiff seeks injunctive and declarative relief, damages, including compensatory and liquidated damages, and all other relief under the ADEA and any other relief that this Court deems appropriate.

## II.   **PARTIES**

1.      Plaintiff, Patrice Kantz, is an individual and current resident of the state of South Carolina, residing therein in Murrells Inlet, South Carolina, 29576.

2.      At the time of the age discrimination that is the subject of this action, Plaintiff lived in, and worked for Defendants out of, Allentown, Pennsylvania.

3.      Plaintiff was born in January, 1962, and is currently 60 years of age.  She was 57 at the time of the termination of her employment.

4.      Defendant AT&T, Inc. is a Delaware corporation that is the parent company of several wholly-owned and controlled subsidiary corporations, including Defendant AT&T Services, Inc.

5.      Defendant AT&T, Inc. is the "alter ego" of its various controlled subsidiary companies, including Defendant AT&T Services, Inc.

5

6.      Defendant AT&T, Inc., by and through its wholly-owned and controlled subsidiary corporations through which it operates and does business, including AT&T Services, Inc., maintains multiple places of business in Pennsylvania, conducts business through its subsidiary companies duly registered to transact business in Pennsylvania, maintains systematic and continuous activity such that it is at home in Pennsylvania, and employs thousands of people in Pennsylvania, including employees subject to and impacted by the discriminatory practices and acts alleged herein and giving rise to this action.

7.      Defendant AT&T Services, Inc. is a Delaware corporation duly registered to transact business in the Commonwealth of Pennsylvania, with a registered agent located in Pennsylvania for service of legal process.  It maintains several places of business located throughout the Commonwealth of Pennsylvania and maintains systematic and continuous activity such that it is "at home" in Pennsylvania.

8.      At all times material hereto, Defendants have been engaged in an industry affecting interstate commerce and have acted as "employers" of Plaintiff and members of the putative class within the meaning of the ADEA.

9.      Defendants share common ownership, management, administrative services, personnel, policies and employment practices.

10.     Defendants hold themselves out to the public and their employees as part of an interconnected AT&T "family of companies" known as "AT&T" which, together and as one entity, employ over 270,000 people.

11.     Defendants are interconnected such that they are considered a "single" and/or "integrated" employer and/or enterprise.

12.     Defendant AT&T Services, Inc. is subject to the personal jurisdiction of this Court because, *inter alia*, the case arises out of or relates to the contacts of AT&T Services, Inc. with the Commonwealth of Pennsylvania, the contacts of AT&T Services, Inc. are continuous and systematic such that AT&T Services, Inc. is at home here, and/or AT&T Services, Inc. has consented to personal jurisdiction by personal service within the Commonwealth via an authorized agent of the corporation.

13.     Defendant AT&T, Inc. is subject to the personal jurisdiction of this Court because, *inter alia*, the case arises out of or relates to the contacts of AT&T, Inc. with the Commonwealth of Pennsylvania, the contacts of AT&T, Inc. are continuous and systematic such that AT&T Services, Inc. is at home here, and/or AT&T, Inc. has consented to personal jurisdiction by personal service within the Commonwealth via an authorized agent of the corporation.   Among other things, and without limitation, the centrally planned and discriminatory workforce reduction that was announced on January 4, 2019 was implemented, at the direction and control of AT&T, Inc., in the AT&T's Technology & Operations business unit in the first quarter of 2019 without regard to corporate formalities or distinctions, such as the identity of the W-2 issuing entity of the employee.

14.     At all times material hereto, Defendants employed more than twenty (20) people.

15.     At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

## III.   <u>JURISDICTION AND VENUE</u>

16.     The causes of action set forth in this complaint arise under the ADEA, as amended, 29 U.S.C. § 621, *et seq*.

17.     The District Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 626(c) and 28 U.S.C. § 1331.

18.     Venue is proper under 28 U.S.C. § 1391(b).

19.     On or about July 28, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination alleged herein.  Attached hereto, incorporated herein, and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with minor redactions for purposes of electronic filing of confidential/identifying information).

20.     On or about November 4, 2019 the EEOC issued to Plaintiff a Dismissal and Notice of Right to Sue for Plaintiff's EEOC Charge.  Attached hereto and marked as Exhibit "2" is a true and correct copy of that Notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

21.     Plaintiff filed her initial Complaint in this case on January 30, 2020, at which time more than 60 days had passed since Plaintiff filed her EEOC charge with the EEOC.

22.     Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## IV.     FACTUAL ALLEGATIONS

23.     AT&T has engaged in systemic age discrimination against its employees age 40 or over ("older workers" or "older employees"), including Plaintiff.

24.     AT&T, by its actions set forth herein, intentionally discriminated against its older workers, including Plaintiff.

25.     AT&T, by its actions set forth herein, have maintained a pattern or practice of age discrimination against older workers, including Plaintiff.

26.     In the alternative, to the extent that AT&T has not intentionally discriminated against it older employees, AT&T's use of one or more of each facially neutral policy or practice as set forth herein had a disparate impact on older employees, including Plaintiff.

### AT&T's Expressed Intention of Transforming Its Aging Workforce And Its 2019 First Quarter Reduction In ATO In Furtherance Thereof

27.     AT&T has a corporate culture of age bias.  Among other things and without limitation:

a.  AT&T has undertaken a massive effort to "transform" and rebrand itself from yesterday's Ma Bell to a nimble, internet and cloud-based company with "workers of the future."

b.  AT&T at the highest levels has publicly discussed its displeasure at having an aging workforce, its intention to transform the company for the "future," and its desire and expectation that older workers will leave its workforce.

c.  AT&T's former Chief Executive Officer, Randall Stephenson, has publicly discussed that AT&T has an aging workforce and had a need to reinvent the company.  *See Gearing Up for the Cloud, AT&T Tells Its Workers: Adapt or Else,* http://www.nytimes.com, February 13, 2016.

d.  AT&T has touted its "Technology Transformation," including "building a workforce for the future," and boasted that the future AT&T workforce will differ greatly from today's workforce in many ways.

e.  AT&T has for years been saying that it needs to be "leaner, faster and more agile" and would be a different company by 2020.

f.  AT&T has publicly flouted the ADEA by continuing to use a General Release and Waiver that violates the ADEA.

g.  Former CEO Stephenson has publicly expressed his expectation that many older workers will exit the AT&T workforce by 2020, which he considered to be a positive thing for the company.

h.  AT&T's former leader of its Communications business segment, John Donovan, has publicly discussed AT&T's "sprint to reinvent itself," and has publicly noted that "AT&T employs about 280,000 people, most of whom got their education and foundational job training in a different era" and that the average tenure at the company is 22 years and that most of AT&T's employees were educated and trained "in a different era."  In these same comments, Mr.

Donovan noted that AT&T redesigned its "practice" by, among other things, redesigning compensation so that it "de-emphasized seniority."

i.  Mr. Donovan expressed that the company was "using innovative solutions to widen, develop and diversify the talent pipeline to address the shortage of current and future technology experts" through such things as "AT&T Aspire." "AT&T Aspire" is a program aimed at developing students as the "next generation of creative thinkers."

j.  As part of its plan to reinvent its aging workforce, AT&T has publicly expressed age-based stereotypes and has acknowledged that those age-based stereotypes are considered in workplace decisions. *See, e.g., AT&T Prepares for a New World of Work: The Changing Work Force (Part 2)*(dividing its workforce by age, characterizing "Baby Boomers" as the workforce of "Yesterday," expressing without stated basis what is important to "Baby Boomers" as distinct from "Gen X" and "Gen Y" workers, explicitly stating that AT&T is taking these age-based stereotypical "factors into account when planning for our workplace of the future," and stating that by 2015, 90% of new hires will be from Gen X and Gen Y.

k.  AT&T has described its "Workplace 2020: Transformation for the Future" as a "Next-Gen Workplace Experience."

l.  AT&T promotes age-defined Employee Resources Groups ("ERGs"). In 2011, AT&T founded an ERG entitled "OxyGEN, Young Professionals of AT&T," whose stated mission is "[t]o attract, develop and retain future leaders of AT&T." In 2014, AT&T launched an ERG entitled "50 & Forward AT&T Professionals Over 50," whose stated mission included "…to support a generation of young leaders at AT&T…". Among the group's publicized initiatives was ""Workforce 2020': 'Better Together' initiative for preparing younger managers to lead an aging workforce.'"

m.  AT&T has openly expressed its desire to hire and retain young employees, and considers age in hiring decisions. For example, and without limitation, its "Leadership and Development Programs," "Technology Development Program" and "Flex Force" are programs intended to recruit young employees into leadership roles.

n.  AT&T has offered incentives to older employees to voluntarily leave its workforce.

28.     AT&T desired a transformation of its workforce into a younger one by the year 2020.

29.      AT&T engaged in a pattern or practice of age discrimination to achieve its desired

transformation of its workforce into a younger one by the year 2020.  Without limitation:

a.      It is AT&T's standard operating procedure to violate the ADEA.  AT&T has continued to present to its terminated older employees a purported "General Release and Waiver" that a United States District Court has determined to be in violation of the ADEA.

b.      It is AT&T's standard operating procedure to make affirmative misrepresentations to its surplussed employees regarding the data it is providing to them when considering whether to release their federal age claims.

c.      It is AT&T's standard operating procedure to intentionally discriminate against older employees by conditioning the receipt of a benefit, severance, upon the execution of a "General Release and Waiver" that violates the ADEA.  Terminated employees age younger than 40 are not required to sign an unlawful release in order to receive the same benefit.

d.      AT&T has communicated its age-biased personnel goals throughout the entirety of AT&T, including throughout its Technology and Operations division.

e.      AT&T executives at the highest level openly express that older employees leaving the AT&T workforce would be a positive thing for the company.

f.      AT&T publicly expresses its desire to develop and retain younger employees to be its leaders of tomorrow.

g.      AT&T has offered programs to incentivize older employees to leave the company.

h.      AT&T's age bias from the top-down infuses and infects the employment decision-making process.

i.      The percentage of older employees in AT&T's U.S. workforce has decreased.  For example, according to AT&T's 2017 and 2018 Diversity & Inclusion reports, the percentage of "Baby Boomers" in AT&T's U.S. workforce has decreased from 26% to 22%.

j.      AT&T has recently been the subject of several age discrimination lawsuits arising from its workforce surplus reductions.  It has been alleged, among other things and without limitation, that AT&T managers "target" employees for selection of surplus and/or termination; that AT&T has excluded younger employees from consideration for surplus and they are

11

thus exempt from possible termination; and that AT&T managers have asked their older employees if they plan to retire.

k.    A jury found that former AT&T employee John Gerundo proved that his age was the determining factor in the decision to surplus his employment in connection with a reduction in force. *Gerundo v. AT&T Servs.*, 2016 U.S. Dist. LEXIS 177583 (E.D. Pa. Dec. 21, 2016)(denying AT&T's post-trial motion for judgment as a matter of law, and upholding the jury's verdict).

l.    AT&T has, since *Gerundo*, continued to follow the same Surplus Guidelines in effect since 2011.

m.    On January 11, 2019, the Honorable Timothy J. Rice of the United States District Court for the Eastern District of Pennsylvania, found that the General Release and Waiver Agreement presented to employees who had been surplussed then involuntary terminated effective January 15, 2018, violated the ADEA, as amended by the Older Workers Benefits Protection Act, and was not an enforceable waiver under the ADEA. *Allison Ray v. AT&T Mobility Services,* LLC, Civil Action No. 2:18-cv-03303 – TR (E.D. Pa. Jan. 11, 2019).

n.    AT&T, since the Court's decision in *Ray*, continued to use the same General Release accompanied by the same legally deficient OWBPA disclosures.

o.    After a five day trial, a jury found that Ms. Ray's age was a determinative factor in AT&T Mobility Services LLC's decision to select her during its reduction in force/surplus and terminate her employment, and that AT&T Mobility Services, LLC either knew or showed reckless disregard for whether its selection of Ms. Ray during the reduction in force/surplus and termination of her employment was prohibited by law.

30.    AT&T has for several years conducted vast involuntary group terminations with the intent of transforming its older workforce into a younger one by the year 2020.  Without limitation:

a.    AT&T considered the age make-up of its U.S. workforce and determined that it had an unacceptably large number of older employees.

b.    AT&T determined that it would transform its workforce by the year 2020 by replacing its older workforce with a younger one.

c.    AT&T determined that its desired workforce transformation would not be achieved by attrition in the normal course and/or incentivizing older employees to terminate employment voluntarily.

12

      d. AT&T determined that in order to transform its workforce into a younger one by the year 2020, it was necessary to involuntarily terminate large numbers of older employees via a group involuntary employment termination program.

31.    Crucial to the viability of AT&Ts determination to intentionally terminate a large number of older employees was curtailing age discrimination lawsuits for doing so. Without limitation:

      a. In order to curtail age discrimination lawsuits against the company, AT&T determined that it would need to obtain from the terminated older employees a release of their right to sue the company under the ADEA.

      b. AT&T is a highly sophisticated company, armed with attorneys, fully aware of anti-discrimination laws.

      c. AT&T was aware that in order to effectively waive an ADEA claim, a release must be "knowing and voluntary," meaning that it must satisfy the OWBPA's requirements as stated in 29 U.S.C. § 626(f)(1).

      d. AT&T was aware that in order to effectively waive an ADEA claim in connection with an employment termination program offered to a group or class of employees, the OWBPA required that AT&T inform the employee in writing in a manner calculated to be understood by the average individual eligible to participate as to (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

      e. AT&T was aware that the purpose of the OWBPA's disclosure requirements for a valid waiver was to provide the employee with the data necessary to evaluate the impact of a group layoff on older workers and assess the strength of a possible age claim in order to make a knowing and informed decision as to whether to release it in exchange for the consideration offered by the employer.

      f. AT&T was aware that, in order to sue the company for age discrimination under the ADEA, an employee has a limited time by which it must first file a charge of age discrimination with the EEOC.

32.     AT&T determined that in order to effectuate its goal of transforming its workforce into a younger one by the year 2020 without facing an onslaught of age discrimination suits, AT&T needed to obtain from terminated older employees the <u>benefit</u> of an ADEA waiver (*i.e.*, foregoing suit) while concealing from them the data that would reveal age discriminatory impact or suggest age discriminatory intent.

33.     AT&T used an employment termination program (*i.e.,* a group layoff, which it calls a "surplus") involving a three step process.  In the first step, AT&T notifies employees of their selection for surplus and termination of employment effective at a later date.  The second step involves a period during which "surplussed" employees may attempt to secure an alternative position at AT&T and thereby avoid termination.  In the third step, AT&T offers terminated employees severance in exchange for what falsely purports to be a "general release" of all claims including through termination, but which AT&T knows is not a valid and enforceable waiver under the ADEA.

34.     AT&T knowingly used a layoff process intended to conceal age discriminatory intent and impact.  Among other things, and without limitation:

   a.   Although it had in mind an overall goal as to the age make-up of its workforce by 2020, AT&T did not conduct one giant layoff whose impact on older employees could have been readily analyzed for statistical significance. Instead, AT&T staggered the layoffs over time and divided up the areas that would be subject to layoff into many different "business cases."

   b.   AT&T identified for purposes of conducting the layoffs "Decisional Units" that were not pre-existing organizational entities.

   c.   AT&T assigned employees to "Affected Work Groups" for purposes of conducting the layoff.

   d.   The group of employees selected for "surplus" was not the same as the group of employees who terminated employment.

35.     AT&T used a layoff process that intentionally and falsely tells terminated older employees that in exchange for severance, they have released all claims under the ADEA. Without limitation:

a.   AT&T AT&T tells the terminated older employees that it has provided them with information required by the OWPBA when AT&T knows this to be false.

b.   AT&T intentionally provides terminated older employees with unintelligible surplus selection data.  Without limitation:

i.   AT&T does not disclose the Decisional Unit in a way that is understandable to the average employee.

ii.   AT&T does not disclose the Affected Work Groups in a way that is understandable to the average employee.

c.   AT&T intentionally withholds from the terminated older employees termination data and does not provide the job titles and ages of those terminated.

d.   By providing unintelligible disclosures as to surplus selection, and no information as to terminations, AT&T intentionally conceals information revealing age discrimination and presents instead an affirmatively false picture of what had occurred in the reduction in force.

e.   AT&T knows that it has not provided to terminated older employees disclosures that comply with the OWBPA's requirements for an enforceable waiver of claims.

f.   AT&T tells the terminated older employees that they must release all claims against AT&T for age discrimination in violation of the ADEA in connection with their termination in order to get and keep severance under the AT&T Inc. Severance Pay Plan when AT&T knows this to be false.

g.   AT&T tells the terminated older employees that by signing the purported "General Release and Waiver" they have waived their right to sue AT&T for age discrimination under the ADEA in connection with their terminations when AT&T knows this to be false.

h.   AT&T, Inc. is the Plan Sponsor, Plan Administrator, and a Named Fiduciary of the AT&T Inc. Severance Pay Plan.  As such, AT&T was a fiduciary charged with fiduciary obligations in its administration of the AT&T Inc. Severance Pay Plan.

   i. AT&T falsely tells the terminated older workers that in exchange for severance, they cannot sue the company for age discrimination under the ADEA with the intent that the employees believe the company and do not sue AT&T for age discrimination.

   j. AT&T falsely tells the terminated older workers that in exchange for severance, they cannot sue the company for age discrimination under the ADEA with the intent to the lull the employees into foregoing action to pursue an age discrimination claim and miss the administrative agency filing deadline.

36. AT&T intentionally used a layoff process by which AT&T fraudulently obtains from the terminated older employees a purported "General Release" that includes a waiver of the employee's statutory right to proceed collectively on an ADEA claim that AT&T has falsely told them they have released and cannot bring suit on anyway.  Without limitation:

   a. AT&T was aware that an ADEA collective action is a vehicle that, without limitation:

     i. would permit a district court to issue notice to terminated older employees that AT&T's "General Release" violated the ADEA by failing to comply with the OWBPA's disclosure requirements, and that the employee could in fact keep their severance payment and sue AT&T under the ADEA for age discrimination in connection with their surplus and termination;

     ii. would, because of the single filing rule, permit a terminated older employee who had been lulled into foregoing  the pursuit of an ADEA claim to recover on an otherwise untimely claim as an opt-in plaintiff;

     iii. would permit older terminated employees from sharing their evidence and pooling their resources; and

     iv. would permit older terminated employees to address AT&T's systemic age discrimination by pursuing claims of age discrimination using a pattern or practice method of proof/evidentiary framework.

   b. AT&T obtains the ADEA collective action waiver through false pretenses by simultaneously presenting it in a General Release and Waiver which falsely tells the employee that he or she cannot sue AT&T under the ADEA.

   c. AT&T obtains the ADEA collective action waiver with the intent of

precluding terminated older employees from ever receiving notice informing them that AT&T's "General Release" that they signed violated the ADEA by failing to comply with the OWBPA's disclosure requirements, and that the employee could in fact keep their severance payment and sue AT&T under the ADEA for age discrimination in connection with their surplus and termination

d.   AT&T was aware that proving disparate impact age discrimination age discrimination requires expert statistical analysis, and that doing so is generally cost prohibitive to an individual plaintiff. AT&T obtains the ADEA collective action waiver from the terminated older employees with the intent of limiting an individual's ability to litigate a disparate impact claim.

e.   AT&T obtains the ADEA collective action waiver from the terminated older employees with the intent of precluding those who were lulled into foregoing the timely pursuit of an ADEA claim from being able to pursue an otherwise timely claim as an opt-in plaintiff in an ADEA collective action.

f.   AT&T obtains the ADEA collective action waiver from the terminated older employees with the intent of limiting their available resources and ability to gather information and evidence of discrimination, and thereby hinder an employee's ability to litigate most effectively a claim of age discrimination.

g.   AT&T obtains the ADEA collective action waiver from the terminated older employee in order to limit the employee's right to pursue an action based on the company's systemic age discrimination.

37.    AT&T intentionally included the ADEA collective action waiver in the "General Release" as part and parcel of its scheme to discriminate against older employees while curtailing via false pretenses lawsuits against the company for doing so.

38.    In 2018, AT&T offered incentives to older employees to voluntarily terminate their employment, including a manager voluntary resignation offer and a one-time limited offer to retire by a certain date and take a lump sum pension benefit calculated based on interest rates that would yield a greater lump sum.

39.    On or about January 4, 2019, AT&T announced a "surplus" (i.e., reduction in force) in in its Technology and Operations divisions.

40.     AT&T's Technology and Operations division is part of AT&T's Communications segment (then led by Mr. Donovan), who reported to AT&T's then CEO and Chair Randall Stephenson.

41.     In a January 4, 2019 message, Jeff McElfresh, President of AT&T Technology and Operations, sent an e-mail message to ATO announcing upcoming reductions to occur in the ATO organization, and others across the company, which were to begin later in January and take place over several months.  Mr. McElfresh expressed that the company since 2014 has been saying that the organization needed to get "leaner, faster and more agile" and would be a "different type of company by 2020," and suggested that because the company must "keep getting faster, leaner and more agile," there would be surplus reductions based on a geographic rationale.

42.     Mr. McElfresh's January 4, 2019 message also reminded employees about the company's one-time-only offer to extend the 2018 interest rates for calculating pension lump sums, and that eligible employees who left employment by March 31, 2019 and elected to receive a pension lump sum by April 2019 would get the benefit of the 2018 interest rate, which yielded a greater lump sum payment amount than 2019 interest rates.

43.     President McElfresh told the ATO managers:  "To win in this new world, we must continue to lower costs and keep getting faster, leaner and more agile.  This includes reductions in our organization, and others across the company, which will begin later this month and take place over several months."

44.     President McElfresh's message stated:  "The desire to be faster, leaner and more agile is also driving decisions regarding where it makes the most sense for employees to be located. It's critical for us to bring employees together to increase the pace of innovation and further

develop the right skills in a more open, flexible, and efficient work environment.  Therefore, our collaboration zones and hub cities become even more integral."

45.     The workforce reductions announced by Mr. McElfresh in January 2019 to take place across ATO in the following months amounted to a single decision, policy or plan that was infected with an age discriminatory aspect and which impacted Plaintiff and the putative class members in the same fashion.

46.     AT&T made the decision to conduct a reduction in force that purportedly considered location in order to eliminate older employees from its workforce.

47.     In fact, the purported consideration of location was a pretext for age discrimination.

48.     In the alternative, and upon information and belief, the consideration of location in the workforce reduction had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

49.     AT&T made the determination as to which geographic locations would be favored in and/or exempt from workforce reduction with the intent to discriminate against older employees.

50.     In the alternative, and upon information and belief, the determination as to which geographic locations would be favored in and/or exempt from workforce reduction had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

51.     AT&T made the determination of an employee's location with the intent to discriminate against older employees.

52.     In the alternative, and upon information and belief, the determination as to an employee's location had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

53.     The ATO organization in which the workforce reduction was to occur was a pre-existing organizational entity.

54.     The surplus event that was announced in ATO in January, 2019 did not impact the entirety of ATO.  Instead, AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees.

55.     AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees purportedly per the policies and practices set forth in its Surplus Guidelines.

56.     AT&T determined which employees in ATO would be subject to possible surplus selection and how to group them for purposes of making the selection surplus decisions and/or providing the OWBPA data to older employees with the intent of discriminating against older employees.

57.     In the alternative, the use of the Surplus Guidelines to determine which AT&T employees in ATO would be subject to possible termination and how to group them for purposes of making the surplus selection decisions had a statistically significant negative impact on the selection for surplus of older employees, including Plaintiff and the putative class members.

58.     AT&T formulated "business cases" within ATO for purposes of selecting employees for surplus.

59.     AT&T's formulation of "business cases" within ATO was intended to discriminate against older workers.

60.     AT&T determined the scope and population of an individual "business case" for purposes of selecting employees for surplus.

61.     AT&T's determination of the scope and population of each of the "business cases" was intended to discriminate against older employees.

62.     A surplus business case purported to describe by certain characteristics groups of employees (called "Affected Work Groups" or "AWGs") for purposes of considering them for surplus selection.

63.     AT&T assembled the AWGs solely to effectuate the reduction.

64.     AT&T assembled the AWGs with the intent to discriminate against older employees.

65.     AT&T formulated Affected Work Groups for purposes of selecting employees for surplus.

66.     AT&T's formulation of Affected Work Groups with the intent to discriminate against older employees.

67.     AT&T populated the Affected Work Groups for purposes of considering them for surplus selection.

68.     Not all employees within ATO were assigned to an Affected Work Group.

69.     AT&T's population of Affected Work Groups was intended to discriminate against older workers.

70.     AT&T determined the scope and population of each Affected Work Group for purposes of selecting employees for surplus.

71.     AT&T's determination of the scope and population of each "Affected Work Group" was intended to discriminated against older employees.

21

72.     Following the approval of the business cases, AT&T selected ATO employees for surplus.

73.     AT&T selected ATO employees for surplus because of their age.

74.     On January 11, 2019, the District Court in the *Ray* case, found that AT&T's standard form "General Release and Waiver" was not an enforceable waiver under the ADEA because AT&T did not disclose information required by the OWBPA.  (*Ray v. Mobility Services, LLC,* 2:18-cv-03303 – TR (E.D. Pa. 11, 2019, ECF No. 28, 29).

75.     The Court in *Ray* stated in its January 11, 2019, Memorandum Opinion (2:18-cv-03303-TR, ECF No. 28): "Because I find AT&T failed to meet the statutory requirements for a valid ADEA waiver by failing to disclose the decisional unit involved in the reduction-in-force, I find the Release invalid and unenforceable, and therefore grant partial summary judgment in favor of Ray as to Count II [violation of the ADEA/failure to comply with the OWBPA] of her complaint."

76.     In its Memorandum Opinion, the Court in *Ray* specifically noted:  "Because 'it is certainly possible that **an employer will want to fiddle with the definition [of the decisional unit] to mask the possible evidence of age discrimination**,' in interpreting the requirements of this section of the statute, the 'touchstone should be the 'understandable to the average worker' standard.'"  (Emphasis added, citation omitted.)

77.     The Court in *Ray* considered the following disclosures that accompanied the "General Release and Waiver" AT&T had provided to Ms. Ray which purported to define the Decisional Unit.

a.     The "Age Discrimination in Employment Act (ADEA) Information Notice Under The Older Workers Benefit Protection Act" provided to Ms. Ray stated, among other things:  "The Decisional Unit is comprised of the

22

        combined Affected Work Group(s) identified in the document entitled "ADEA Listing" (refer to Section E below).  Each Affected Work Group within the Decisional Unit is comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected."

    b.    Section E of the ADEA Information Notice provided to Plaintiff states: "The ADEA Listing, which was included in your Surplus Notification documentation, provides the ages and job titles of employees in the Decisional Unit who were and were not selected for participation in the Plan."

    c.    The ADEA Listing provided to Ms. Ray stated, among other things: "**Affected Work Groups (AWG)** are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected.  An AWG may be any portion of an organization, described in terms of level, job title, similar job functions, geography, lines of organization or other definable attributes based on needs of the business. The combined AWGs comprise the Decisional Unit for this business case."

78.     The district court in *Ray* makes clear that once AT&T created the decisional unit the way it did (as comprised of Affected Work Groups created for purposes of conducting a reduction in force), it had and obligation to describe it clearly enough for an average worker to understand the scope of the pool from which terminated employees were selected.

79.     The district court in *Ray* stated:  "Because AT&T's combined work groups were assembled solely to effectuate the reduction, terminated employees such as Ray had no meaningful understanding of their composition or origin.  Although AT&T attempted to define the Affected Work Groups, it used – perhaps purposefully – vague language such as 'positions … with similar definable characteristics' and 'any portion of an organization' without identifying those characteristics of what portions of the organization they encompassed.  This definition was not understandable to the average worker and did not reflect the process utilized in selecting employees for the reduction."

80.     On January 28, 2019, AT&T notified those employees in ATO who were selected for "surplus."

81.     When AT&T on January 28, 2019,  notified employees in ATO that they were selected for surplus, AT&T was aware of the *Ray* decision invalidating the "General Release" and entering judgment against AT&T for its violation of the ADEA for failure to comply with the OWBPA.

82.     Each ATO  surplussed employee received a standard surplus packet of materials that was materially identical to those at issue the *Ray* case.

83.     Each surplussed employee received the same standard form Surplus Notification letter, stating the exact same reason for his or her surplus selection:   "Throughout the past several weeks we have been evaluating certain business units within the AT&T family of companies. After a thorough and careful review, we have determined that the position which you currently hold will be eliminated.  This is due to a reduction in positions within your level and organization. As a result of this decision, you will be placed on surplus …"

84.     The Surplus Notification letter did not indicate that location was used as a consideration in the reduction process.

85.     The Surplus Notification letter stated to the employee that it was providing them with a "General Release & Waiver".

86.     This statement misrepresented that the release document that AT&T was  providing the employee with was a "general" release, when in fact, AT&T knew that the document was not an enforceable release under the ADEA.

    a.  When AT&T presented to Plaintiff the General Release and Waiver, a
        materially identical General Release and Waiver had previously been
        determined by the United States District Court for the Eastern District of
        Pennsylvania in the *Ray* case to be in violation of the ADEA because it was not

accompanied by disclosures required by OWBPA for a valid and enforceable ADEA waiver.

87.     The Surplus Notification letter stated that it was providing the employee with "Information required by the Age Discrimination in Employment Act (ADEA)".

88.     This statement was false.  In fact, AT&T knew that the information it was providing ("Age Discrimination in Employment Act (ADEA) Information Notice Under The Older Workers Benefit Protection Act")   failed to provide the information required by the ADEA for an enforceable waiver.  On the contrary, AT&T provided the exact same definitions of Decisional Unit and Affected Work Group that the Court in *Ray* found insufficient to satisfy the OWBPA's requirements.

89.     Even though the Memorandum Opinion in *Ray* explicitly notes the possibility that "an employer will want to fiddle with the definition [of the decisional unit] to mask the possible evidence of age discrimination" and noted that AT&T "used – perhaps purposefully – vague language" to define Affected Work Groups, AT&T provided the exact same definitions as at issue in *Ray*.  The OWBPA disclosures that accompanied the "General Release and Waiver" in the ATO surplus stated, among other things:

      a.    The "Age Discrimination in Employment Act (ADEA) Information Notice Under The Older Workers Benefit Protection Act" stated, among other things:  "The Decisional Unit is comprised of the combined Affected Work Group(s) identified in the document entitled "ADEA Listing" (refer to Section E below).  Each Affected Work Group within the Decisional Unit is comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected."

      b.    Section E of the ADEA Information Notice states:  "The ADEA Listing, which was included in your Surplus Notification documentation, provides the ages and job titles of employees in the Decisional Unit who were and were not selected for participation in the Plan."

      c.    The ADEA Listing provided to Plaintiff states, among other things:

"**Affected Work Groups (AWG)** are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected.  An AWG may be any portion of an organization, described in terms of level, job title, similar job fuctions [sic], geography, lines of organization or other definable attributes based on needs of the business.  The combined AWGs comprise the Decisional Unit for this business case."

90.     As a result of the *Ray* decision,  Defendants are estopped from asserting the validity or enforceability of the "General Release and Waiver" as to ADEA claims.

91.     In the "General Release and Waiver," AT&T affirmatively and falsely represented to terminated older employees that, at the time of their selections for surplus, it had provided the ages and job titles of those "designated to participate in the [AT&T, Inc. Severance Pay Plan]."

92.      AT&T  knew its representation to be false.  The AT&T, Inc. Severance Pay Plan required, as a condition of eligibility, that its participants had to have actually been terminated from employment.

93.     AT&T's representations were in breach of its fiduciary obligations.

94.     The ADEA Information Notice falsely states:  "The ADEA Listing, which was included in your Surplus Notification documentation, provides the ages and job titles of employees in the Decisional Unit who were and were not selected for participation in the Plan."

95.     As used in the ADEA Information Notice, "Plan" refers to the AT&T Inc. Severance Pay Plan.

96.     The ADEA Listing falsely states:  "The list below provides the ages and job titles of employees in the Decisional Unit who are and are not designated for company-initiated involuntary termination and participation in the AT&T Inc. Severance Pay Plan.  Those marked

'selected' are eligible to participate in the Plan; those marked 'not selected' are not eligible to participate in the Plan."

97.     Accordingly, the General Release, ADEA Information Notice, and ADEA Listing provided to Plaintiff and the putative class members affirmatively and falsely represented to them that it had provided to them the ages and job titles other employees who had been placed on surplus status *and* terminated.

98.     However, as of January 28, 2019 (the date stated on the ADEA Listings), no one identified on the ADEA Listings provided to Plaintiff and the putative class members was actually eligible for participation in the Severance Plan because none of those employees had yet been terminated.  In fact, some employees who had been placed on surplus status along with Plaintiff and the putative class members were able to find other positions at AT&T within the sixty (60) day period.

99.     Thus, contrary to the affirmative and false representation contained in the General Release, AT&T *did not*, and *could not have*, informed Plaintiff and the putative class members which employees were eligible for participation in the Plan.

100.     AT&T purposefully concealed from the terminated older employees the demographic data as to actual terminations resulting from the workforce reduction because, upon information and belief, the termination data would reveal age discrimination.

.

101.     The General Release and Waiver presented to Plaintiff and putative class members is invalid and unenforceable as to claims under the ADEA.  It contains material misstatements of fact, is misleading, is not knowing and voluntary, and fails to comply with the strict informational disclosure requirements of the OWBPA. Without limitation:

        a.      The General Release and Waiver and accompanying ADEA Listing do not

sufficiently identify the "Decisional Unit" in a manner calculated to be understood by the average worker.  *See Ray v. AT&T Mobility Services, LLC,* ECF Nos. 28, 29.

b.      The General Release and Waiver fails to provide the disclosures required for a knowing and voluntary waiver of rights and claims under the ADEA.

c.      The General Release and Waiver provides no information to terminated workers as to who is actually being terminated and who is being retained.

d.      The General Release and Waiver provides no meaningful information,  in a manner calculated to be understood by the average individual, regarding the criteria used for placing certain employees on surplus status.

e.      The General Release and Waiver provides no meaningful information, in a manner calculated to be understood by the average individual, regarding the "organization" to which an employee is assigned in the accompanying ADEA Listing.

f.      The ADEA Listings purports to describe but in fact does not provide meaningful information as to the AWG category, the basis for employees receiving different AWG numbers, or why those with different AWGs are grouped together for purposes of the ADEA Listing.

g.      None of the General Release & Waiver, Surplus Notification Letter and ADEA Information Notice Under the OWBPA states to which AWG an employee was assigned.

h.      The ADEA Listing does not accurately state the AWG to which an employee was assigned for purposes of surplus selection.

i.      The ADEA Listing does not reflect job titles and ages of all those within the same organization.

j.      The ADEA Listing does not provide the same information as to the AWGs, job titles and ages of those selected for surplus as AT&T told the EEOC.

102.    In an Order dated June 20, 2019, the Court in *Ray* stated that the employees other than Ms. Ray who were part of her termination group "must be informed of the release's invalidity and given the option of joining Ray's claim."  (2:18-cv-03303-Tr, ECF No. 47.)

28

103.    AT&T did not inform its current or former employees who had signed a materially similar release accompanied by materially similar non-OWBPA compliant that the release was invalid under the ADEA.

104.    On the contrary, even after this June 20, 2019 Order from the Court: a)  AT&T continued to use the same standard form "General Release and Waiver" accompanied by materially similar non-OWBPA compliant disclosures and to falsely tell its terminated older employees that in order to get and keep severance they had released their ADEA claims and could not sue the company for age discrimination; and b) AT&T used the invalid General Release to defend against charges of age discrimination at the EEOC, without ever telling the agency that it the "General Release and Waiver" was unenforceable as to ADEA claim.

105.    AT&T intentionally presented to older terminated employees  a "General Release and Waiver" that the company knew was not a knowing and voluntary waiver as a matter of law.

106.    AT&T knowingly, intentionally and falsely told older terminated employees that they had released their right to sue the company for age discrimination under the ADEA, when, in fact, they did not.

107.    AT&T knowingly, intentionally and falsely told older terminated employees that in order to get and keep severance, they could not sue AT&T for age discrimination under the ADEA.

108.    Simultaneously, AT&T fraudulently obtained through the use of its unlawful General Release and Waiver a collective action waiver including a purported waiver of an older employee's statutory right to proceed collectively against AT&T on an ADEA claim.

109.    The purported waiver an older employee's right to bring and/or participate in a collective action under the ADEA (the "ADEA collective action waiver") is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

110.    The purported waiver of an older employee's right to bring and/or participate in a collective action was not entered into knowingly or voluntarily by Plaintiff or the putative class members.

111.    The purported waiver of claims and right to bring and/or participate in a collective action under the ADEA is so interwoven with the purported release of the individual ADEA claims by the older terminated employees that it is indivisible from the same and cannot be separately enforced.

112.    The purported waiver of claims and right to bring and/or participate in a collective action under the ADEA is a gratuitous promise not supported by adequate consideration.

113.    AT&T did not request from older terminated ATO employees a manifestation of assent to the purported waiver of the right to bring or participate in a collective separate from the manifestation of assent requested for the release of their individual ADEA claims.

114.    AT&T fraudulently obtained from terminated older ATO employees a purported waiver of their statutory right to proceed collectively on an ADEA claim by intentionally and falsely telling them, in effect, that they would be waiving the right to proceed collectively on a claim that they had released anyway.

115.    The waiver of an older employee's statutory right to bring an ADEA collective action lawsuit is inextricably tainted by AT&T's intentionally false representation that they had released their right to sue the company for age discrimination under the ADEA, when, in fact, they did not.

116.    AT&T obtained the ADEA collective action from older terminated employees simultaneously with AT&T's unlawful termination of older employees because of age.

117.    The collective action waiver as to ADEA claims is an integral part of AT&T's unlawful scheme to transform its workforce into a younger one.

118.    AT&T obtained the ADEA collective action waiver from the terminated older employees with the intent of precluding those who were lulled into foregoing the timely pursuit of an ADEA claim from being able to pursue an otherwise timely claim as an opt-in plaintiff in an ADEA collective action.

119.    AT&T obtained the ADEA collective action waiver from terminated older employees with the intent of limiting their available resources and thereby hinder an individual employee's ability to prove a case of age discrimination.

120.    AT&T obtained the ADEA collective action waiver in order to limit an older employee's  right to pursue an action based on the company's systemic age discrimination.

121.    AT&T intentionally included the collective action waiver in the "General Release" as part and parcel of its scheme to discriminate against older employees while curtailing via false pretenses lawsuits against the company for doing so.

122.    AT&T's unlawful scheme to eliminate its older employees while curtailing lawsuits for doing so could not have proceeded without the collective action waiver.

123.    The ADEA collective action waiver is tainted by AT&T's unlawful conduct.

124.    AT&T obtained the ADEA collective action waiver from terminated older employees by means of fraud, deceit, unconscionability, and/or bad faith.

125.    The ADEA collective action waiver, if enforced, would preclude other terminated older employees from ever receiving notice informing them that, contrary to what AT&T told them, the release that they signed did not validly waiver their claims under the ADEA.

126.    The ADEA collective action waiver, if enforced, would preclude other terminated

31

older employees who were lulled by AT&T into forgoing the pursuit of an ADEA claim from recovering for AT&T's discrimination.

127.    The ADEA collective action waiver, if enforced, would preclude terminated older employees from pooling their resources to litigate their age discrimination claims.

128.    The extraordinarily high cost of a qualified expert to do an analysis and report sufficiently reliable to show disparate impact or probative of disparate treatment cannot as a practical matter be borne by an individual plaintiff.

129.    It is highly improbable that an individual older employee litigant could retain an expert to perform a statistical analysis.

130.    The ADEA collective action waiver, if enforced, would unfairly limit an employee's rights.

131.    The ADEA collective action waiver, if enforced, would limit an individual older employee plaintiff's ability to litigate most effectively an age discrimination claim using all of the tools the law provides.

132.    The ADEA collective action waiver, if enforced, would limit an individual older employee plaintiff's rights by precluding the pursuit of a pattern or practice claim of age discrimination.

133.    The ADEA collective action waiver, if enforced, would affect the balance of equities between the parties.

134.    The ADEA collective action waiver, if enforced, would effectively insulate AT&T from liability for its systemic age discrimination.

135.    The ADEA collective action waiver, if enforced, would effectively immunize AT&T from redress of grievances arising from its unlawful age discrimination.

136.   The ADEA collective action, if enforced, would effectively further AT&T's scheme to transform its workforce into a younger one by terminating older employees.

137.   The doctrine of unclean hands under Pennsylvania contract law bars AT&T from enforcing the ADEA collective action waiver in the General Release and Waiver.

138.   The ADEA collective action waiver in the General Release and Waiver was unconscionable at the time it was made and thus unenforceable under Pennsylvania law.

  a.   The ADEA collective action waiver is procedurally unconscionable. Among other things, and without limitation: i) it was drafted by AT&T; ii) it was not subject to negotiation; iii) there was a great imbalance of power between the parties; iv) the terminated older employees were especially vulnerable having just been terminated from employment; v) it was obtained through false pretenses by AT&T; vi) it was obtained by AT&T in breach of its fiduciary duties; and vii) it was presented simultaneously with AT&T's intentionally false representation that the employee had released any claim under the ADEA and could not sue AT&T anyway under the ADEA.

  b.   The ADEA collective action waiver is substantively unconscionable. Among other things, and without limitation, if enforced: i) it would limit an older employee's rights by precluding older employee's with otherwise untimely claims from pursuing them; ii) it would keep older employees in the dark that AT&T violated the ADEA; iii) it would limit an older employee's rights by effectively precluding them from using statistics as evidence of disparate impact or disparate treatment; iv) it would limit an older employee's right to pursue a pattern or practice claim of age discrimination; v) it would effectively immunize AT&T from redress for its unlawful age discrimination; and vi) it would further AT&T's scheme to eliminate older employee's from its workforce by effectively insulate AT&T from liability for doing so.

139.   The Court should not enforce the "General Release and Waiver" as to ADEA claims and their pursuit through a collective action.

### *Plaintiff Patrice Kantz*

140.   Plaintiff was a highly qualified and dedicated employee for AT&T for more than thirty-seven (37) years.

141.    From approximately May, 1991, Plaintiff held the position of Senior Technical Project/Program Manager in AT&T's Technology & Operations business unit ("ATO").

142.    Plaintiff was well qualified for the position of Senior Technical Project/Program Manager.  In fact, she was on the promotion list for advancement.

143.    Plaintiff's extensive knowledge, skills, experience, and record of achievement as a successful Senior Technical Project/Program Management employee were recognized by AT&T.

144.    Plaintiff received annual merit increases and performance-based bonuses, her annual performance reviews were positive, and her performance rating was in the top ten percent (10%) of AT&T domestically and internationally.

145.    Since approximately 1996, Plaintiff was a teleworker who worked from her virtual office and from AT&T's satellite office in Allentown PA.

146.    Prior to that, Plaintiff had lived in Allentown and worked in Bedminster, New Jersey.

147.    Plaintiff worked on projects across the globe and across the country.

148.    Plaintiff's projects were software based, and Plaintiff's location had no bearing on the performance of her duties as a Senior Technical Project/Program Manager.

149.    The successful performance of Plaintiff's job duties did not require her to work in AT&T's satellite office in Allentown, Pennsylvania, or in any other particular physical location.

150.    In or about January, 2017, Plaintiff began reporting to Wendy Flynn, Area Manager (approximately age 52).

151.    Ms. Flynn was physically located in Pittsburgh, Pennsylvania.

152.    Ms. Flynn reported to Suzanne Halverson, Director (approximately age 46).

153.    Ms. Halverson was physically located in Redmond, Washington.

154.    In or about June, 2019, Ms. Halverson asked Plaintiff if she would be willing to relocate to Middletown, NJ.

155.    Plaintiff responded that she could not relocate to Middletown, New Jersey, but told Ms. Halverson that she would be willing to relocate to Bedminster, New Jersey.

156.    On January 28, 2019, AT&T notified Plaintiff that she had been selected for "surplus."

157.    The Surplus Notice letter provided to Plaintiff stated:  "Throughout the past several weeks we have been evaluating certain business units within the AT&T family of companies. After a thorough and careful review, we have determined that the position which you currently hold will be eliminated.  This is due to a reduction in positions within your level and organization. As a result of this decision, you will be placed on surplus …"

158.    AT&T's statement that Plaintiff was selected for "surplus" because her position was eliminated is false and a pretext for age discrimination.

159.    AT&T's statement that Plaintiff's position was eliminated was false.  According to the ADEA Listing AT&T provided to Plaintiff, there remained at least ten Senior Technical Project/Program Management employees in Plaintiff's "organization" for purposes of the surplus.

160.    Ms. Halverson told Plaintiff that she was placed on "surplus" status because she was not in one of AT&T's "collaboration zones" and that her position was being eliminated.

161.    Plaintiff received no explanation as to what a "collaboration zone" was.

162.    Plaintiff asked if AT&T had considered her expressed willingness to relocate and work in Bedminster, New Jersey.

163.    In connection with its investigation of Plaintiff's Charge of discrimination, AT&T among other things, stated to the EEOC: "Ms. Kantz was assigned in King of Prussia, Pennsylvania as a level 2 Senior-Technical Project/Program Manager…"

164.    Plaintiff did not work in King of Prussia, Pennsylvania.

165.    AT&T in 2018, upon information and belief, assigned Plaintiff to King of Prussia because of her age.

166.    In connection with its investigation of Plaintiff's Charge, AT&T told the EEOC that Bedminster, New Jersey was among the favored "geographically aligned ATO cities."

167.    AT&T's determination for purposes of surplus selection that Plaintiff was located in King of Prussia was a pretext for age discrimination.

168.    AT&T determined that Plaintiff was assigned to King of Prussia for purposes of surplus selection, rather than Bedminster, New Jersey – the location to which Plaintiff told Ms. Halverson she was willing to relocate – because of her age.

169.    AT&T did not select for surplus all individuals who were outside a preferred geographic location.

170.    Following her "surplus" notification, Plaintiff applied for at least twelve open and available positions for which she was qualified.

171.    Plaintiff applied to a few teleworker positions.

172.    Most of Plaintiff's applications were for positions in Bedminster, New Jersey.

173.    Bedminster, New Jersey was a location where Plaintiff had previously worked, which Plaintiff told AT&T she was willing to work, and where, in fact, Plaintiff was willing to work.

174.     Apparently, and unbeknownst to Plaintiff, an employee's assigned location for purposes of the surplus selection was used by AT&T as a negative factor in the hiring selection process.

175.     AT&T did not even interview Plaintiff for the positions to which she applied and was qualified.

176.     AT&T did not offer Plaintiff a position and her employment was terminated effective March 29, 2019.

177.     AT&T's apparent restrictions regarding the hiring of surplus applicants based on the applicant's assigned location were intended to discriminate against older employees.

178.     AT&T's consideration of Plaintiff's location was a pretext for discrimination.

179.     AT&T rejected Plaintiff for these open positions for which she was qualified because of her age.

180.     In the alternative, and upon information and belief, AT&T's geographic restrictions applicable to the consideration of surplussed applicants for open positions and/or its consideration of an internal applicant's location (actual or assigned) had a statistically significant negative impact on the hiring rates of older applicants and/or the termination rates of older employees, including Plaintiff.

181.     Following Plaintiff's selection for surplus and termination, and according to AT&T's own documents, there remained at least ten Senior Technical Project/Program Management positions in Plaintiff's "Organization" for purposes of surplus selection.

182.     According to AT&T's own documents, AT&T retained at least eight employees younger than Plaintiff in the position of Senior Technical Project/Program Management in Plaintiff's "Organization" for purposes of surplus selection.

183.    According to AT&T's own documents, AT&T retained at least three employees substantially younger than Plaintiff in the position of Senior Technical Project/Program Management in Plaintiff's "Organization" for purposes of surplus selection.

184.    Based on Plaintiff's knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, Plaintiff was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three substantially younger employees who were not selected for surplus.

185.    Further, there remained several Senior Technical Project/Program Management employees, including at least nine (9) who reported to Flynn, and at least an additional two employees reporting to Flynn who performed the same functions as Plaintiff who held different job titles.

186.    Following her termination, AT&T retained several younger Senior Technical Project/Program Management employees reporting to Ms. Flynn.  Without limitation, AT&T retained at that time the following substantially younger employees in the Senior Technical Project/Program Management position: Kenneth Lam (38); and Samieh Franklin (38).

187.    Based on Plaintiff's knowledge, skills, and positive track record with AT&T, including in particular her twenty-four (24) years as a Senior Technical Project/Program Management employee, Plaintiff was better qualified than these substantially younger individuals who were retained.

188.    AT&T selected Plaintiff for surplus because of her age.

189.    AT&T rejected Plaintiff's applications for at least twelve open positions for which she was qualified because of her age.

190.    AT&T terminated Plaintiff's employment because of her age.

191.    In the alternative, AT&T's consideration of location (actual or assigned) in connection with surplus selection decisions and/or consideration of a surplussed applicant's location (actual or assigned) had a statistically significant negative impact on the surplus selection and/or termination rates of older employees, including Plaintiff.

192.    As a direct result of AT&T's discriminatory conduct, Plaintiff has in the past incurred, and will in the future incur, economic losses, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

193.    AT&T presented to Plaintiff the standard form General Release and Waiver, which was accompanied by standard form AT&T ADEA Information Notice and ADEA Listing.

194.    AT&T presented to Plaintiff the same General Release and Waiver with accompanying disclosures that were materially identical to those a United States District Court had previously determined in the *Ray* case to be in violation of the ADEA.

195.    The ADEA Listing provided to Plaintiff stated "Business Case ID: 18-545."

196.    The ADEA Listing provided to Plaintiff stated:  "Organization:  Technical Field Services JUAN FLORES – SVP – TECHNICAL FIELD SERVICES."

197.    The ADEA Listing provided to Plaintiff stated:  "ADEA Listing as of Jan 28, 2019."

198.    AT&T has admitted that the AWGs set forth in the ADEA Listing provided to Plaintiff were created as part of the reduction in force in which Plaintiff was selected for surplus and were not preexisting established divisions of AT&T's organizational structure before the surplus exercise.

199.     As part of the workforce reduction process in connection with the business case involving Plaintiff, AT&T identified Affected Work Groups in Technical Field Services for reduction.

200.     Not every employee in Technical Field Services was assigned to an Affected Work Group in connection with Business Case 18-545.

201.     The job titles and ages of employees in Technical Fields Services who were not assigned to Affected Work Groups in connection with Business Case 18-545 were not disclosed in the ADEA Listing provided to Plaintiff.

202.     Pursuant to the Surplus Business Case, AT&T assigned Plaintiff to AWG 1.

203.     For purposes of the ADEA Listing, Plaintiff was assigned to AWG 13.

204.     The ADEA Listing provided no information regarding AWG 1.

205.     Although pursuant to the Surplus Business Case, Plaintiff was assigned to AWG 1, the ADEA Listing made no reference whatsoever to an AWG 1.

206.     AT&T provided no explanation to Plaintiff as to why she was assigned to AWG 1 for purposes of surplus selection, but assigned to AWG 13 for purposes of the ADEA Listing.

207.     At the same time that AT&T provided the ADEA Listing to Plaintiff, AT&T provided to other surplussed employees in "Business Case 18-558"– but not Plaintiff – an ADEA Listing that stated: "Organization:   Technical Field Services JUAN FLORES – SVP – TECHNICAL FIELD SERVICES;" and "ADEA Listing as of Jan 28, 2019."

208.     The ADEA Listing for Business Case 18-558 also stated that Affected Work Groups (AWG) are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected.

209.    The ADEA Listing for 18-558  that was not provided to Plaintiff had ages for job titles that that appeared similar to those in the ADEA Listing provided to Plaintiff.  At least one job title (Area Manager Network Engineering*) in the organization "Technical Field Services JUAN Flores – SVP – Technical Field Services" appeared on both ADEA Listings, but had different "AWGs" and age information.

210.    AT&T provided no explanation to Plaintiff as to why surplussed employees in the same organization ("Technical Field Services Juan Flores – SVP – Technical Field Services) were assigned to different AWGs and on what basis, and why AT&T provided job titles/ages/surplus selection status for only some employees in the organization and on what basis it was determined as to which information to provide.

211.    The ADEA Listing provided to Plaintiff does not provide information regarding whether the employment of those individuals selected for surplus was later terminated.

212.    AT&T on or about August 12, 2019, submitted a position statement on behalf of AT&T Services, Inc. in response to the charge of discrimination filed by Plaintiff.

213.    In its EEOC Position Statement, AT&T asserted, among other things:

    a.    "The *nationwide* surplus included the elimination 94 positions in 14 affected work groups ("AWG").  Kantz was in AWG 1, which consisted of 62 level 2 managers located in 46 cities throughout the country, in a number of job titles performing Program/Program management for USP, Tier 3 and similar support.  All of the 62 positions were eliminated because the individuals were assigned to cities that were not geographically aligned with the new organization design.

    b.    "Kantz's immediate workgroup included retained managers in geographically aligned ATO cities including:  Atlanta, Georgia, Bedminster, New Jersey, Tustin, California, Schauburg, Illinois, and Plano, Texas, that were not surplus."

    c.    AT&T provided Ms. Kantz with a Surplus Notification Letter, General Release and Waiver, an ADEA Information Notice Under The OWBPA, and ADEA Listing with a list of job titles and ages of employees in the

decisional unit which satisfied the requirements under the OWBPA for the valid release of ADEA claims.

d.    Even if Ms. Kantz had any viable claims for age discrimination, she released those claims when she signed a General Release.

214.    AT&T did not tell the EEOC that although it represented in August 2019 that Plaintiff was in AWG 1, it had given OWBPA disclosures indicating that she had been assigned to AWG 13.

215.    The "immediate work group" referenced in AT&T's Position Statement is not a reference to the AWG to which Plaintiff was assigned for purposes of the ADEA Listing.

216.    AT&T did offer any sort of explanation for the discrepancy.

217.    AT&T did not tell the EEOC that the General Release had been held unenforceable under the ADEA by a federal judge, and that the referenced OWBPA disclosures had specifically been determined <u>not</u> to satisfy the requirments under the OWBPA for a valid release of ADEA claims.

218.    The General Release and Waiver's is invalid and unenforceable as to Plaintiff's ADEA claims for the reasons stated above with regard to all older terminated ATO employees as well as those stated above in this section addressing Plaintiff in particular.

219.    The General Release and Waiver's collective action waiver is invalid and unenforceable as to Plaintiff's ADEA claims for the reasons stated in with regard to all older terminated ATO employees.  Further, and without limitation:

a.    The ADEA collective action waiver, if enforced, would prejudice Plaintiff's ability to pursue an age discrimination claim.

b.    The ADEA collective action waiver, if enforced, would preclude Plaintiff from pooling resources with other older terminated ATO employees to litigate her age discrimination claim.

c.    The ADEA collective action waiver, if enforced, would effectively preclude

Plaintiff from learning information from other older ATO terminated employees probative of AT&T's age discrimination.

d.   The extraordinarily high cost of a qualified expert to do an analysis and report sufficiently reliable to show disparate impact or probative of disparate treatment cannot as a practical matter be borne by Plaintiff proceeding on an individual basis.

e.   The ADEA collective action waiver, if enforced, would limit Plaintiff's rights by precluding her pursuit of a pattern or practice claim of age discrimination.

220.   The doctrine of unclean hands under Pennsylvania contract law bars AT&T from enforcing the ADEA collective action waiver against Plaintiff.

221.   The ADEA collective action waiver in the General Release and Waiver was unconscionable at the time it was made and thus unenforceable against Plaintiff under Pennsylvania law.

222.   The ADEA collective action waiver is part and parcel of AT&T's unlawful discrimination and should not be enforced against Plaintiff.

223.   The Court should not enforce the "General Release and Waiver" as to Plaintiff's ADEA claim and her right to bring it as an ADEA collective action.

224.   Plaintiff brings this action pursuant to ADEA, 29 U.S.C. § 626(b), incorporating section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), individually on behalf of herself and on behalf of similarly situated older workers who have been harmed by AT&T's age discriminatory conduct.

225.   Plaintiff is similarly situated to putative collective action opt-in members in that, among other things and without limitation:  Each was age 40 or over when terminated in connection with AT&T's age discriminatory workforce reduction in ATO announced by its President on January 4, 2019; each when notified of surplus selection worked for AT&T from locations in Pennsylvania and was a resident of Pennsylvania; each was subject to a centrally

planned workforce reduction with a uniform rationale; each was subjected to the same, standardized and centrally controlled surplus and termination policies and procedures; each was notified of surplus on January 28, 2019, and terminated employment on March 29, 2019; each was given the same standardized packet of documents in connection with the reduction; each was informed in writing of the exact same reason for the decision to select them for surplus; each was intentionally discriminated against by AT&T because of their age; in the alternative, each was subject to the same facially neutral policies and practices that caused a statistically significant disparity in the surplus selection rates and/or termination rates of older employees; each was knowingly and intentionally presented with a "General Release and Waiver" that a federal district court had already found to be in violation of the ADEA; each was knowingly and falsely told by AT&T that they had released their right to sue AT&T for age discrimination under the ADEA when they had not; and AT&T fraudulently obtained from each a waiver of their statutory right to proceed collectively on their ADEA claims (which AT&T had unlawfully told them they had released) that is unenforceable under Pennsylvania law.

**COUNT I**
**VIOLATION OF THE ADEA**
**(Disparate Treatment)**

226.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint, as if fully set forth herein.

227.    AT&T intentionally discriminated against Plaintiff and the putative class members because of their age.

228.    By committing the foregoing acts of discrimination AT&T has violated the ADEA.

44

229.     As a direct result of AT&T's violation of the ADEA, Plaintiff and the putative class members have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

230.     AT&T's acts of discrimination in violations of the ADEA were intentional and willful under the circumstances and warrant the imposition of liquidated damages.

231.     As a direct and proximate result of AT&T's violation of the ADEA, Plaintiff and the putative class members have sustained the injuries, damages, and losses set forth herein.

232.     Plaintiff and the putative class members are now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&T's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

233.     No previous application has been made for the relief requested herein.

**COUNT II**
**VIOLATION OF THE ADEA**
**<u>(Disparate Impact)</u>**

234.     To the extent that AT&T's facially neutral employment policies and practices have not been used by AT&T to discriminate intentionally against older employees, AT&T's use of one or more of each has resulted in a disparate impact against employees age 40 or over, including Plaintiff and the putative class members, as follows:

a.   Upon information and belief, AT&T's policy to consider location in the ATO workforce reduction announced in January, 2019 has resulted in a statistically significant disparity in the selection for surplus rates of its older employees.

b.   Upon information and belief, AT&T's policy as to which locations would be favored in and/or exempt from workforce reduction in the ATO workforce reduction announced in January, 2019 has resulted in a statistically significant

disparity in the selection for surplus and/or termination rates of its older employees.

c. Upon information and belief, the determination of an employee's location in the ATO workforce reduction announced in January, 2019, has resulted in a statistically significant disparity in the selection for surplus and/or termination rates of its older employees.

d. Upon information and belief, AT&T's use of the Surplus Guidelines to determine which employees in ATO would be subject to possible termination  and how to group them for purposes of making the surplus selection decisions in connection with its January, 2019, surplus event has resulted in a statistically significant disparity in the selection for surplus and/or termination rates of its older employees.

e. Upon information and belief, AT&T's geographical restrictions (actual or assigned work location) applicable to the consideration of surplussed applicants for open positions and/or its consideration of an internal applicant's geographic location code (actual or assigned) in hiring has resulted in a statistically significant disparity in the termination rates of its older employees surplussed in connection with the January 2019 surplus event in ATO.

f. Upon information and belief, AT&T's consideration of geographic location (actual or assigned) in connection with surplus selection decisions and/or consideration of a surplussed applicant's geographic location (actual or assigned work location) in connection with its January, 2019, surplus event in ATO has

resulted in a statistically significant disparity in the termination rates of older employees.

235.    AT&T, by the policies and/or practices set forth herein, has violated the ADEA.

236.    As a direct result of AT&T's violation of the ADEA, Plaintiff and the putative class members have in the past incurred, and will in the future incur, a loss of earnings and/or earnings capacity, loss of benefits, and other injuries, the full extent of which is not known at this time.

237.    As a direct and proximate result of AT&T's violation of the ADEA, Plaintiff has sustained the injuries, damages, and losses set forth herein.

238.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of AT&T's discriminatory and unlawful acts unless and until the Court grants the relief requested herein.

239.    No previous application has been made for the relief requested herein.

**COUNT III**
**VIOLATION OF THE ADEA – FAILURE TO COMPLY WITH THE OWBPA**

240.    Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint as though set forth in their entirety.

241.    Plaintiff, on behalf of herself individually and on behalf of all similarly situated employees, asserts claims against Defendants for violations of the OWBPA, as set forth herein.

242.    Defendants by their above-described improper and discriminatory acts, have violated the ADEA, as amended by the OWBPA.

243.    No members of the putative class, including Plaintiff, were given OWBPA-compliant releases; therefore, none released his or her claims under the ADEA.

244.    The General Release and Waiver given to Plaintiff and the putative class members did not constitute a valid release of claims or rights under the ADEA, including the right to bring and/or participate in a class, collective, or representative action.

245.    As a direct and proximate result of Defendants' failure to comply with OWBPA waiver requirements and violations of the ADEA, Plaintiff and the putative class members have been misled regarding their rights under federal law and/or harmed in the prosecution of their claims under the ADEA.

246.    In addition to all other damages, Plaintiff and the putative class members are entitled to declaratory relief, declaring the General Releases and Waivers invalid as to all claims and rights under the ADEA.

247.    As a direct and proximate result of Defendants' failure to comply with OWBPA waiver requirements and violation of the ADEA, Plaintiff and the putative class members have sustained the injuries set forth herein.

248.    Plaintiff and the putative class members are now suffering and will continue to suffer irreparable injury as a result of Defendants' discriminatory acts unless and until this Court grants the equitable relief requested herein.

249.    In addition to all other damages, Plaintiff and the putative class members are entitled to equitable relief, including an injunction against Defendants from further using the non-OWBPA compliant release and notifying those who signed it of its invalidity.

## **RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and members of the putative class, respectfully requests that this Court enter judgment in her favor and against Defendant:

a)      conditionally certifying this matter pursuant to 29 U.S.C § 216(b) and facilitating

notice to all members of the putative class of the existence of this lawsuit and their right to "opt-in" to the same.

b)      declaring the acts and practices complained of herein to be in violation of the ADEA;

c)      declaring the acts and practices complained of herein to be in violation of the OWBPA;

d)      declaring the General Release and Waiver signed by Plaintiff and members of the putative class to be invalid and unenforceable as to claims brought under the ADEA;

e)      declaring the General Release and Waiver signed by Plaintiff and members of the putative class to be invalid and unenforceable as to an ADEA collective action waiver;

f)      enjoining and restraining permanently the violations alleged herein;

g)      enjoining and restraining Defendants from raising the General Release as a defense to Plaintiff's claims in this matter or the claims of the putative class members;

h)      awarding compensatory damages to Plaintiff and members of the putative class to make them whole for all past and future lost earnings, benefits, and earnings capacity which they have suffered and will continue to suffer as a result of Defendants' discriminatory conduct;

i)      awarding liquidated damages to Plaintiff and members of the putative class pursuant to the ADEA;

j)      awarding Plaintiff and members of the putative class the costs of this action, together with reasonable attorney's fees;

k)      awarding Plaintiff and members of the putative class such other damages as are appropriate under the ADEA and OWBPA; and

l)      granting such other and further relief as this Court deems appropriate.

Respectfully submitted,

**CONSOLE MATTIACCI LAW**

By:    <u>/s/ *Susan M. Saint-Antoine*</u>
Stephen G. Console
Laura C. Mattiacci
Susan M. Saint-Antoine
Daniel S. Orlow
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
console@consolelaw.com
mattiacci@consolelaw.com
santanto@consolelaw.com
orlow@consolelaw.com
(215) 545-7676 phone
(215) 545-8211 fax

*Attorneys for Plaintiff,*
*Patrice Kantz*

Dated:  March 30, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **PATRICE KANTZ** | : | |
| *on behalf of herself individually* | : | |
| *and on behalf of those similarly* | : | |
| *situated,* | : | |
| | : | **CIVIL ACTION NO. 2:20-cv-00531-JCJ** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **AT&T, INC.** | : | |
| **and** | : | |
| **AT&T SERVICES, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

_____ :

## CERTIFICATE OF SERVICE

I, Susan M. Saint-Antoine, hereby certify that a true and copy of Plaintiff's

Amended Complaint was served upon the below-listed counsel for Defendants, via ECF, this

**30th Day of March, 2022:**

Kenneth W. Gage
Sara B. Tomezsko
**Paul Hastings LLP**
200 Park Avenue, 30th Floor
New York, NY 10166

William J. Leahy
**Littler Mendelson P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102

s/ *Susan M. Saint-Antoine*
Susan M. Saint-Antoine

# Exhibit "1"

| AMENDED CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | ☐ FEPA<br>X EEOC | |

| STATE OR LOCAL AGENCY: Pennsylvania Human Relations Commission |
|---|

| NAME (Indicate Mr., **Ms.**, Mrs.)<br>**Patrice Kantz** | HOME TELEPHONE NUMBER *(Include Area Code)*<br>redacted |
|---|---|

| STREET ADDRESS<br>redacted | CITY, STATE AND ZIP<br>Murrells Inlet, SC 29576 | DATE OF BIRTH<br>redacted |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>AT&T, Inc.<br>AT&T Services, Inc. | NUMBER OF EMPLOYEES, MEMBERS<br>>200,000 | TELEPHONE (Include Area Code)<br>(210) 821-4105 |
|---|---|---|

| STREET ADDRESS<br>**Charging Party's Work Location**<br>1140 Catasauqua Aveue<br>**AT&T Corporate Headquarters**<br>208 S. Akard Street | CITY, STATE AND ZIP<br><br>Allentown, PA 18102<br><br>Dallas, TX 75202 | COUNTY<br><br>Lehigh, PA<br><br>Dallas, TX |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>☐ Race  ☐ Color  ☐ Sex  ☐ Religion  ☐ National Origin<br>☐ Retaliation  X Age  ☐ Disability  ☐ Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>*Earliest*            *Latest*<br>                            03-29-19 (ongoing) |
|---|---|

**The Particulars Are:**

A.    1.    Relevant Work History

I was employed by AT&T, Inc. and its controlled subsidiary/payroll company, AT&T Services, Inc. (together, "AT&T"), from May 10, 1982 until the date of my unlawful termination of employment effective March 29, 2019.

At the time of my termination, I held the position of Senior Technical Project/Program Management. I last reported to Wendy Flynn, Area Manager (55[1]). I began reporting to Flynn in or about January 2017. Prior to reporting to Flynn, I had reported to Philip Gaito, Director Technical Operations (70). Flynn reported to Susan Halverson, Director (46).

At the time of my surplus notification and termination, I was age fifty-seven (57) with more than thirty-seven (37) years of service at AT&T.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| 7/28/19                *Patrice Kantz*<br>Date           Charging Party Signature | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

---

[1] All ages herein are approximations.

Case 2:20-cv-00531-PBT Document 4 Filed 01/30/20 Page 54 of 62

**EEOC Charge of Discrimination, Page 2 of 8**
**Initials of Charging Party →PX**

1.    Relevant Work History (continued)

I was a highly qualified and dedicated employee for AT&T for more than thirty-seven (37) years. My extensive knowledge, skills, experience, and record of achievement as a successful Senior Technical Project/Program Management employee were recognized by AT&T. Among other things, I received annual merit increases and performance-based bonuses, my annual performance reviews were positive, and my performance rating was in the top ten percent (10%) of AT&T domestically and internationally.

2.    Harm Summary

I believe that AT&T discriminated against me because of my age (57) as part of a centrally planned, corporate-wide (*i.e.*, AT&T, Inc. and the many subsidiary entities under its direction and control, self-identified as the AT&T "family of companies") involuntary group termination program, implemented in waves from at least March 1, 2013 and still continuing, intended to "transform" an aging workforce, and which intended to, and did, eliminate older workers and replace them with younger ones, while falsely and fraudulently telling the older workers that they had released claims under the Age Discrimination in Employment Act ("ADEA") when AT&T knew that they had not.

On January 28, 2019, AT&T notified me that that I was not in one of AT&T's collaboration zones, that the position that I held was being eliminated, and that I was being placed on "surplus status." I was to remain employed until March 29, 2019, at which time my employment was to be terminated if I had not been selected by AT&T for, and accepted, another position at AT&T.

On January 28, 2019, AT&T also presented to me a "General Release and Waiver" which fraudulently purported to release all claims against AT&T, including federal age discrimination claims with respect to my employment and (possible future) termination of employment. The General Release and Waiver was simultaneously accompanied by an "ADEA Listing" dated January 28, 2019 which, among other things, provided no information as to the identity of individuals actually terminated by AT&T.

After January 28, 2019, AT&T did not select me for any open and available positions with AT&T for which I was qualified and had applied.

AT&T terminated my employment effective March 29, 2019. That date was the commencement of the forty-five (45) day period for me to consider the General Release and Waiver. AT&T provided me at that time no disclosures required for an involuntary group termination pursuant to the Older Workers Benefit Protection Act ("OWBPA").

I signed and returned to AT&T the General Release and Waiver on March 28, 2019s. The purported waiver of my claims and right to bring and/or participate in a collective and/or representative action under the ADEA is invalid, unenforceable, and in violation of the ADEA, as amended by the OWBPA.

B.    Respondents' Stated Reasons

AT&T has stated that I was placed on surplus status because I was not in one of AT&T's collaboration zones and my position was being eliminated. This is a pretext for age discrimination. The statement that my position was being eliminated was false, and I received no explanation as to what a "collaboration zone" was. Following the surplus, according to AT&T's own documents, there remained at least ten (10) Senior Technical Project/Program Management positions in my "Organization." Further, there remained several Senior Technical

Project/Program Management, including at least nine (9) who reported to Flynn, and at least an additional three (3) employees reporting to Flynn who performed the same functions as me who held different job titles.

AT&T has not stated a reason why AT&T failed to select me for any open and available positions for which I was qualified and had applied.  I did not receive any response from AT&T to any of the positions for which I was qualified and had applied.

AT&T has stated that I was to be terminated if I was unable to secure another position within sixty (60) days of my being placed on surplus status.  AT&T gave a false and pretextual reason for my selection for surplus; AT&T has given no reason for its failure to select me for any one of the open positions for which I was qualified and had applied.

AT&T has not stated any reason for its fraudulent representation to me that by signing the General Release and Waiver I had released and waived my claims and rights under the ADEA, including my right to bring and/or participate in a collective and/or representative action, when AT&T knew that they had presented me with a General Release and Waiver that was invalid, unenforceable, and in violation of the OWBPA.

C.    Statutes Violated and Basis for Allegations

I allege that Respondents have discriminated against me based on my age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621. *et seq.* ("ADEA") and the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f) ("OWBPA").

Evidence of discrimination includes, but is not limited to (in addition to what is set forth herein):

1) AT&T has a corporate culture of age bias and a public record of egregious age discrimination.

2) AT&T's Chief Executive Officer, Randall Stephenson, has publicly discussed that AT&T has an aging workforce and had a need to reinvent the company. *See Gearing Up for the Cloud, AT&T Tells Its Workers: Adapt or Else,* http://www.nytimes.com, February 13, 2016. As part of this reinvention, AT&T came up with a plan to "retool" its aging workforce by the year 2020. *Id.*

3) As part of its plan – variously called "Vision 2020," "Workforce 2020;" "Workplace 2020" – AT&T has publicly expressed age-based stereotypes and has acknowledged that those age-based stereotypes are considered in workplace decisions. *See, e.g., AT&T Prepares for a New World of Work: The Changing Work Force (Part 2),* https://networkingexchangeblog.att.com/enterprise-business (dividing its workforce by age, characterizing "Baby Boomers" as the workforce of "Yesterday," expressing without stated basis what is important to "Baby Boomers" as distinct from "Gen X" and "Gen Y" workers, explicitly stating that AT&T is taking these age-based stereotypical "factors into account when planning for our workplace of the future," and stating that by 2015, 90% of new hires will be from Gen X and Gen Y).

4) Upon information and belief, since at least March 1, 2013, and continuing until the present, AT&T has, as part of its plan to transform its workforce, conducted vast involuntary terminations (referred to herein as "2020" terminations) with the intent and effect of eliminating older workers from its workforce.  The massive and company-wide involuntary terminations were effectuated in waves across AT&T, Inc.'s various controlled/for payroll-purposes subsidiaries and in accordance with centrally planned,

from the top, corporate-wide policies and procedures infected with age bias and, upon information and belief, causing a disparate impact on older workers.

a) Upon information and belief, as part of the "2020" terminations, AT&T, per its policies and procedures, notified certain workers that they were being placed on surplus status and would be terminated if unable to secure another position with AT&T within sixty (60) days. Employees were selected for surplus based on centrally determined, company-wide ill-defined and/or subjective criteria in a process infected with age bias. Without limitation, employees were assigned a rating for "skills," but the "skills" supposedly assessed were not those necessary to perform an actual job but a job of the "future" per "Vision 2020," thus permitting managers to assign ratings based on the ageist stereotype that older workers could not or would not acquire "high tech" skills necessary for these future jobs.

b) The process by which certain employees on surplus status were able to secure another job within AT&T was infected with age bias. Among other things, the centrally determined, company-wide surplus policies and procedures specifically provided that managers could at their complete discretion notify certain – but not all – employees on surplus status of job openings by sending to them a Career Opportunity Notice ("CON"), thus permitting managers to act on unchecked age-bias and notify younger workers only of open positions. Moreover, per AT&T policies and procedures, it was automatically made known to a hiring manager when an application was received for an open job if the application was submitted by an employee whom AT&T had selected for surplus status, thus tainting that employee's application prospects.

c) If an employee has not secured a position at the end of the sixty (60) day period, an employee who had been placed on surplus status was terminated by AT&T. AT&T offered such terminated employees severance in exchange for signing what purported to be a general release of all claims (including their right to bring suit, and/or participate in a collective/representative action under the ADEA). AT&T knew that what it falsely told the older workers was a general release of all claims was not a release and waiver of an older worker's right to bring and/or participate in an individual and/or collective action alleging age discrimination under the ADEA because the General Release and Waiver did not comply with the disclosure requirements of the OWBPA. Without limitation, **AT&T provided to the older workers no information as to who was actually being terminated and who was being retained.**

d) AT&T affirmatively represented to the older, terminated workers that it had provided to them at the time of the surplus notification the ages and job titles of those "designated to participate in the Plan." This was patently false. The Plan referenced was the AT&T, Inc. Severance Pay Plan; to be eligible to participate in it, among other things, one had to have been terminated from employment. The list provided did not identify any one who had actually been terminated. In fact, some employees who had been placed on surplus status and listed on the ADEA Listing were able to find other positions at AT&T within the sixty (60) day period. **Thus, AT&T fraudulently induced older workers to release rights pertaining to their termination, while hiding from those older workers information as to the ages of who was terminated and who was retained.**

e) Upon information and belief, AT&T has for years, and at least since March 1,

Case 2:20-cv-00531-RBT Document 47 Filed 09/30/21 Page 42 of 47

2013, and continuing through the present, carried out in waves its "2020" terminations with the intent and effect of terminating older workers from its workforce, while retaining and hiring younger ones. AT&T has intentionally kept the older workers in the dark about the scope of its terminations and selection procedures, and has engaged in a massive fraud whereby older workers were deceived as to the information they were receiving regarding who was terminated and who was retained, and falsely led the older workers to believe that they had waived their right to bring an action against AT&T for age discrimination.

5) Since at least 2013 until the time of my termination, AT&T has actively recruited outside hires.

6) I was notified by AT&T that I was placed on surplus status, terminated, and presented with a fraudulent General Release and Waiver as part of AT&T's "2020" terminations.

7) AT&T selected me for surplus, failed to select me for any open and available jobs for which I was qualified and had applied, terminated my employment, and presented me with a false and fraudulent General Release and Waiver because of my age.

8) On January 28, 2019, AT&T notified me that I was not in one of AT&T's collaboration zones, that my position was being eliminated, and that I was placed on surplus status with sixty (60) days to try to find a job or else be terminated.

   a) The statement that my position was being eliminated was false.

   b) The statement that I was not in one of AT&T's collaboration zones was not explained me.

9) On January 28, 2019, AT&T presented me with a purported General Release and Waiver and accompanying "ADEA Listing." Among other things, and without limitation:

   a) The General Release and Waiver and its accompanying materials purport to specify criteria but in fact provide no meaningful information as to the criteria used for selecting employees for surplus notification. The General Release and Waiver and its accompanying materials stated the following with regard to the criteria used for selecting employees for surplus notification: "The considerations when designating eligible employees for company initiated involuntary termination and participation in the AT&T Inc. Severance Pay Plan include some or all of the following: business needs, criticality of skills, job performance, role elimination, geographic location, and/or employee preference for displacement ('interest in leaving')."

   b) The General Release and Waiver and its accompanying materials provided no information explaining the specific reason(s) for my selection for surplus notification.

   c) The General Release and Waiver stated falsely that I was provided with the ages and job titles of those designated to participate in the Severance Plan. In fact, as of that date, no one identified on the ADEA Listing was eligible for the Severance Plan.

   d) Accompanying documents were marked as "PROPRIETARY Not for use or

disclosure outside AT&T Inc. and all its wholly owned subsidiaries and controlled companies, except under written permission," thereby attempting to discourage me and other older workers from sharing the information with an attorney or other AT&T employees.

e) The information provided in the "ADEA Listing" was for an "Organization" identified as "Technical Field Services Juan Flores – SVP-Technical Field Services." There was no information explaining what this "Organization" identification meant, and no information provided as to how this Organization was determined or who was assigned to it.

f) The ADEA Listing contained a category entitled "AWG." The ADEA Listing defines "AWG" as "Affected Work Groups," which "are comprised of positions at the same level with similar definable characteristics from which the surplus employees are selected. An AWG may be any portion of an organization, described in terms of level, job title, similar job functions, geography, lines of organization or other definable attributes based on needs of the business. The combined AWGs comprise the Decisional Unit for this business case." The ADEA Listing purports to describe but in fact does not provide meaningful information as to AWG numbers, the AWG category, or AWG assignments. The ADEA Listing does not indicate why I was assigned to a certain AWG 13 and why others were assigned different AWG numbers.

g) The Release and General Waiver provided no information as to the basis a particular AWG number was assigned and why those with different AWGs are grouped together for purposes of the ADEA Listing.

h) The ADEA Listing does not indicate who among the employees was terminated.

i) AT&T failed to provide required information and disclosures under the OWBPA, including failing to provide the cumulative information regarding numbers of employees in my Decisional Unit.

10) The average age of the Senior Technical Project/Program Management employees included in the Organization was 54.29. The average age of the Senior Technical Project/Program Management employees in the Organization selected for surplus was 57.71.

11) I was apparently assigned to AWG 13. I was never told by AT&T the basis of my or others' assignment to AWG 13.

12) Per the ADEA Listing, of the seventeen (17) Senior Technical Project/Program Management employees assigned to "AWG 13," I was one (1) of seven (7) selected for surplus by AT&T. Of the ten (10) employees in AWG 13 that AT&T did not select for surplus status, eight (8) were younger than me, including some who were substantially younger (including three (3) employees under age fifty (50)).

a) Based on, *inter alia,* my knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, I believe I was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three (3) substantially younger employees, in AWG 13 who were not selected for surplus.

EEOC Charge of Discrimination, Page 7 of 8
Initials of Charging Party – PK

13) Per the ADEA Listing, there were seventeen (17) employees who held the Senior Technical Project/Program Management positions in the Organization, seven (7) of whom were selected for surplus. There were three (3) Senior Technical Project/Program Management employees younger than age fifty (50) who were not selected for surplus and were retained by AT&T.

   a) Based on, *inter alia,* my knowledge, skills, and positive track record with AT&T, including in particular as a Senior Technical Project/Program Management, I believe I was at least as, or better, qualified than all of the Senior Technical Project/Program Management employees, including the three (3) substantially younger employees, who held that position, were not selected for surplus, and were retained by AT&T.

14) On March 29, 2019, AT&T terminated my employment.

15) AT&T retained several younger Senior Technical Project/Program Management employees reporting to Flynn. Based on, *inter alia,* my knowledge, skills, and positive track record with AT&T, including in particular my twenty-four (24) years as a Senior Technical Project/Program Management employee, I believe I was better qualified than these younger individuals who were retained. Without limitation:

   a) When I was terminated, AT&T retained the following substantially younger employees, without limitation, in the Senior Technical Project/Program Management position, reporting to Flynn: Kenneth Lam (38); and Samieh Franklin (38).

16) AT&T terminated the oldest employees reporting to Flynn. Without limitation:

   a) When I was terminated, AT&T terminated the following older employees, without limitation: Lisa Erman (55), Senior Technical Project/Program Management; and Flynn (55).

17) As of the termination of my employment on March 29, 2019, I was instructed to consider signing the General Release and Waiver in exchange for a severance payment.

   a) AT&T never provided me with the disclosures required by the OWBPA.

   b) AT&T never provided me with information indicating that it was the job titles and ages of those who had actually been terminated from employment.

   c) The "ADEA Listing" that was given to me on January 28, 2019 was not given to me at the commencement of the General Release and Waiver consideration period as explicitly required by the OWBPA.

   d) AT&T failed to provide to me in a manner calculated to be understood by the average individual eligible to participate in the Severance Pay Plan program the disclosures required for a knowing and voluntary waiver of my claims and rights under the ADEA, including my right to bring an age discrimination suit against them and to initiate and/or participate in a collective and/or representative action.

18) My performance was positive and did not warrant my selection for surplus, the fact that I was not selected for open positions for which I was qualified and had applied, or the termination of my employment.

EEOC Charge of Discrimination, Page 8 of 8
Initials of Charging Party — PK

19) Upon information and belief, AT&T's "2020" group involuntary termination program, including its centrally determined policies and procedures, had a disparate impact on older workers.

20) AT&T has demonstrated an intent to terminate the employment of older workers, including me, and retain younger workers instead.

21) AT&T fraudulently induced me and other older workers to sign a General Release and Waiver that they knew to be in invalid, unenforceable, and in violation of the OWBPA.

D.    Class Charge

I allege that AT&T has engaged in a pattern and practice of discriminating against older workers in violation of the ADEA. In that regard, I bring this Charge as a class and pattern and practice Charge on behalf of myself and any and all current or former employees, age forty (40) and over who have been adversely affected by AT&T's discriminatory practices (as a result of disparate treatment or disparate impact) in connection with its company-wide group terminations, implemented in waves pursuant to the same centrally determined and corporate-wide policies and procedures, since at least March 1, 2013 and continuing through the present, including but not limited to being placed on surplus status; being denied opportunities to secure or being rejected for open positions; and/or being terminated.

I further allege that AT&T has violated the ADEA, as amended by the OWBPA, and that the language, terms, and manner of presentation of AT&T's General Release and Waiver agreements utilized during the company-wide involuntary group terminations since at least March 1, 2013 and continuing through the present, is part of a pattern and practice to adversely treat and disparately impact me and similarly situated employees age forty (40) and over, and was a scheme in violation of the ADEA and OWBPA with the intention of deceiving me and other older workers into believing that we could not sign the General Release and Waiver, collect severance, and bring an age discrimination case against AT&T. In that regard, I bring this Charge as a class Charge on behalf of those individuals age forty (40) and over whom AT&T terminated as part of the involuntary group terminations since at least March 1, 2013, and continuing through the present, who were presented with a General Release and Waiver which purported to be a general release of all claims, including for age discrimination under federal law and the right to bring and/or participate in a collective and/or representative action under the ADEA, but which failed to comply with the OWBPA.

# Exhibit "2"

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Patrice Kantz<br>redacted<br>Murrells Inlet, SC 29576 | From: | Philadelphia District Office<br>801 Market Street<br>Suite 1300<br>Philadelphia, PA 19107 |
|---|---|---|---|

|  | ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2019-04876 | Legal Unit,<br>Legal Technician | (267) 589-9700 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R. Hutter*

Dana R. Hutter,
**Deputy Director**

**November 4, 2019**
(Date Mailed)

Enclosures(s)

cc:   **AT&T**
**Laura Givens (for Respondent)**
**Employee Relations Manager**
**1057 Lenox Park Blvd**
**C-210**
**Atlanta, GA 30319**

**Emily R. Derstine Friesen, Esq. (for Charging Party)**
**CONSOLE MATTIACCI LAW, LLC**
**1525 Locust Street, 9th Floor**
**Philadelphia, PA 19102**